Judge Undeuwoop,-
delivered the opinion of the court.
In1 October, 1810, William Hunter of Frankfort, executed a deed purporting to convey to Achilles Sneed and George W. Pleasants, of tue same town, as trustees, a certain lot of ground with its appurtenances, situated in the town of Frankfort, containing -sixty six feet front on Montgomery street, and running • one hundred and forty feet back, being the same lot as stated in the deed which was conveyed to said Humer by Philip Caldwell, William Trigg and Susanna his wife, by deed bearing date the 30th April, 18,11. The trustees, or the survivor of them, his heirs or assigns were, {recording to the stipulations of the deed, to have and to hold the said lot with the appurtenances, in trust, to and for the sole and Separate use of Ann Hunter, (wife of the said William,) her heirs and assigns foreyer, in as full and ample.a.manner as if she were sole and unmarried; and .for the further trust, that they or the survivor of them,his heirs and assigns, “shall and will, under the ' *546 direction and by and with the consent and approbation of the said Ann Hunter, make leases of the premises from time to time, and receive and take the rent, issues and pro fits thereof, and pay over the same to the said Ann Hunter or her order in writing, who shall receive and dispose of the same ather will and pleasure,notwithstanding her coverture, without the intervention or control of her said husband; and upon tins further trust, that the said pi emises or any part thereof, or the rent, issues or profits 1 hereof, shall not in any wise be in the power of the said W'm. JJnnter, or subject to his intermeddling, or in any manner liable to ihe pay moniofhisdebtsorengagements. And, upon this further u usl and confidence,that the said Ann Hunter, ¡loiwiihAa.odingher cover ture, or whether she be covert or sole, shall have full power to mortgage, sell and dispose of all or any part of the premises hereby granted, by deed, gift, grant or conveyance, or by any writing in the nature of a will, to such person or persons and for such estate or estates, as she shall think proper; and the said A. Sneed and G. W. Pleasants, and the survivor of them, his heirs and assigns, shall and will do and execute all such matters, acts and things in deed and in law, as may be necessary to cany intoelíóctsoch dispositionsas aforesaid,by virtue hereof. And, upon this further trust, that if the said Ann Hunter should happen to die without disposing of the premises, or declaring or appointing any uses thereof, then t.helrustcosorsurvivo.-,his heirs and assigns, to stand and be seized of Use premises and every part thereof, to and for ihe only purpose, use and behoof of all and every the children of said Ann Hunter, born and to be born, their several and respective heirs and assigns forever, equally to be divided between them, shave and share alike, as tenants in common and not'as joint tenants; and on failure <-f a child or children of the said Ann to take under the trust, then of and to tne use and behoof oftlie right heirs of the said Ann forever.”
The deed of trust was signed and sealed by the grantor and trustees, attested by William Litteli and Robert Johnson, and handed over to Achilles Sneed. This took place at the residence of William Hunter upon the premises mentioned in the deed, no person being present but the grantor, trustees and subscribing witnesses. This deed has never been recorded in any clerk’s office. There is upon it in the hand *547 writing of Achilles Sneed, (who was clerk oí’ the court of appeals previous to 1810, and continued to be so un'til after the commencement of this suit,) the following memorandum: “The within is to be considered as acknowledged for record, unless otherwise directed by W. II. before the expiration of eight months from the 1st March, 1816.”
One of the trustees, G. W. Pleasants, died 8th April, 1812. The trustees failed to take possession of the trust estate. They made no leases of any part of it; and it does not appear that Ann Hunter gave them or either of them any directions concerning it. William Hunter and his family continued to reside in the buildings upon the lot after the execution of the trust deed, as they had done before. In 1811, Wdliam flun.cr, in the character of owner, rented a store room in the building to Smith <& Sterling. In 1816, month of July, .William Hunter advertised the property for sale in the Argus. William Hunter continued the ostensible owner of the property from the date of the conveyance to Sneed and Pleasantsvup to the 19lh of October, 1819, when he conveyed it to II. Blanton, Robert Wilkinson and S. M. Major, in trust, to secure the payment of $17,132 to the bank of Kentucky. Many depositions of citizens, who had long resided in Frankfort were taken, to show that the execution of the deed to Sneed and Pleasants was unknown to the community until after the commencement of this suit, and that Hunter’s credit; rested to some extent upon the property mentioned in ■ the deed. Robert Johnson, one of the subscribing witnesses, states, in his deposition taken in August, 1822, as follows: “I believe the deed of trust was made without the knowledge of any but the parties concerned and the subscribing witnesses. So far as I know, the community had no knowledge or suspicion of the existence of such a deed. If was not a matter of notoriety. I never heard it mentioned publicly by Mr. Hunter or any other person from the time it was made until recently, and since the bankruptcy of said Hunter.”
At the time the deed offrust to Sneed and Pleasants ■ was executed, i t is abundantly established that William ■ Hunter was possessed of estate, real and personal, olher than that included in the deed of trust, to a considera» *548 ble value, and' that he Was an industrious, enterprising man? excellent credit. It does not appear that any debt, which he owed at that time, remains unpaid. The conclusion is irresistible that there are none such, for the proof is clear that his- credit was unshaken and his means ample until 1817. During that year he met a disastrous blow in the failure of Sproule, Armstrong & Co., for whom he was endoser or surety to large amounts,, and for wliom he had to pay large sums. It seems, notwithstanding this shock, William Hunter’s entire failure did not take place until 1819.
The debt of $ 17,132, owing by William Hunter to the Rank, was evidenced by nine different notes, upon each of which there were endorsers. These endorsers for blunter to the number of thirteen, constituted pau ties of the second part, in the deed from Hunter of the first part to Blanton, Wilkinson & Major of the third part. All the parties signed the deed, making seventeen signatures. There is no proofof its execution except the certificate of Willis A. Lee, clerk of the Franklin county court, which states that the- deed was produced to him in his office on the 19th of October, 1820, and was acknowleged by WillianHunter, &c. (giving their names,) and on the 21th September, 1821, was acknowledged by C. S. Todd, and that the same is truly recorded. Todd was one of Hunter’s endorsers. On the back of the deed, bearing date 19th October, 1819, is this endorsement: “Acknowledged by all the date within, W. Lee, C. G. C.” “except Pearson and Todd.” “Acknowledged by Todd 24th September, 1821.” Isaac Pearson, on the face of the deed, is stated to be an endorser for Hunter and one of the parties, but it does not appear tiiat he ever executed the deed by signing and sealing. C. S. Todd was an endorser for Hunter, was a party to the deed, and had signed and sealed.
On the 9th of July, 1821, the President, Directors and Company of the Bank of Kentucky, instituted this suit against William Hunter, Blanton, Wilkinson and Major, with a view to coerce the collection of their debt. The subpoena was executed on William Hunter on the 11th July, 1821. On the day befo, e, as it would seem from an endorsement on the subpoena copied into fhe record, Blanton, Wilkinson and Major acknowledge *549 ed service of the subpoena, but their is no evidence on record that their acknowledgements of the service was proved in court. •
On the 10th of November, 1821, the trustees of Frankfort executed a deed of conveyance for the lot and its appurtenances to LeonardH. Lyne,of Henderson county, in trust, for the sole and separate use of the said Ann Hunter, wife of the said William, containing, in substance, the same stipulations in relation to the nature and objects of the trust as are contained in the deed from WilliamHunter to Sneed and Pleasants,'and which have already been stated. Upon this deed is the following endorsement: “ In testimony of my acceptance of the within trust, I have hereunto set my hand and seal this 20th day of November, 1821.
LEO. H. LYNE, (Seal.)”
' This deed and the endorsement have been within proper time recorded in the clerk's office of the Franklin county court. This deed sets out the reasons on the part of the trustees for its execution, and the manner in which Mrs. Ann Hunter derived her interest as cestue que trust. From its recitals, it appears that James Wilkinson and wife, on the 29th December, 1791, sold and conveyed the lot to John Gano, who conveyed the, same to Daniel Gano, who conveyed the same to Philip Caldwell and William Trigg, who conveyed the same to William Hunter on the 30th April, 1804, as already stated, who conveyed to Sneed and Pleasants in trust as aforesaid. The deed from the trustees of the town to L. H. Lyme, states that Mrs. Hunter made application to them for the deed; and it is in proof that she did negotiate through her husband with the trustees of the town for a deed; that her husband attended before the board of trustees for the town, and stated the manner in which he derived title to the lot, the nature of his wife’s claim, and also made known to the trustees the claim set up to the property by the Hank of Kentucky derived through him. Nothing appears to us which will justify the inference, that Mr., Hunter, the husband, either suppressed the truth, or suggested a falsehood in his communications with the trustees of the town, to •induce them to execute the deed to Lyne in behalf of his wife,
*550 At {be time William Hunter executed the deed to Plantón, Wilkinson and Major, with a view to secure the payment of the bank debt, Achilles Sneed was a stockholder and director of the bank, and so continued until after the deed was executed by the trustees of Frankfort to Lyne. At the date of this last deed, A. Sneed was also a trustee for the town of Frankfort, and was notified to attend the meeting of the board which was to decide on Mrs. Hunter’s application for a deed, and the object of convening the board on that business made known to him. He declined attending.
It was in proof that William Hunter after his marriage, in right of his wife, had acquired two or three thousand dollars, being the avails of her portion of her father’s estate, and that the property conveyed by him to Sneed and Pleasants was worth about $12,000. A. Sneed’s deposition was taken, but rejected by the court as incompetent, upon the scor'e of interest. We think the court decided correctly in rejecting it. The principle is settled in the case of Bank of Kentucky vs. Williams’ heirs, decided at the present term. Wc, therefore, leave out of view some facts which Sneed’s deposition would authorize us to state.
The Bank, by an amendment to her original bill, brought Lyne and Mrs. Hunter before the court as defendants, and charged the title set up by them to be fraudulent, and unavailing when brought in competition with their right to subject the property to the payment of their debt. The complainants assailed both,the deeds, executed by William Hunter to Sneed and Pleasants, and that executed by the trustees of Frankfort to Lyne, as fraudulent in respect to thorn, and destitute of any sufficient consideration to support either deed. •
Mr. Lyne, in his answer states, that the trustees of" Frankfort claimed no consi den-, tion from him as an inducement to make the conveyance but that which was first paid to the original proprietor, (James Wilkinson,) as acknowledged by his deed to John Gano, from whom-the title descended, through others, (as he was informed,) to Ann Hunter. He charges, that the deed from William Hun'er to Sneed and Pleasants, was fairly made, upon proper consideration, and refers to it. Mrs. Hunter, in her answer, insists tnat Lyne ■ should hold *551 xhe property for her benefit according to the trust, because she was entitled to it under the provisions of the deed made to Sneed and Pleasants, the consideration of which last was an estate in her own right of considerable value, received by her husband. For the nature and value of it she refers to the answer of her husband and the testimony filed. Mr. Hunter, in his answer, speaking of the execution of the deed of,trust to Sneed and Pleasants, says: “ after many years spent in the most active industry, this defendant found himself in possession of a sufficiency of property to pay every debt he owed and leave a considerable surplus. Aware of the hazards of life, and the accidents to which all men are liable, he had long contemplated it as a duty to set apart some portion of his property for the future provision and support of an affectionate wife and rising oilspring, and more particularly as that wife had, through her parents, furnished him with part of the means by which he had acquired that properly.” This is all which his ans.wer contains relative to any property received by him. which belonged to his wife, and which constituted any consideration or inducement to the execution of the deed to Sneed and Pleasants. Each of these defendants deny all fraud imputed to them.
Property ob'ained by the-wife, is not l^cmshhration as will support a conseftWnTon the wife,made by hi/a ynars c. ti/noHhe property; unlessj there ■was an ante-tr ot oraríagrnemont, pri or to reducing topowSsn, to make a settlement on lcr"
*551 Mrs, Hunter’s father died intestate in 1791, leaving a real and personal estate, which, when divided among his four children, gave to each a portion worth about $2,,550 or >¡,’2,600, according to the testimony of one of the heirs and distributees. Too real estate of the inteslate was sold in 1805. William Hunter purchased the tract including the residence of his deceased father-in-law, which tie sold in 1813, for about $2,600, one third in hand, the other two thirds to be paid in one and two years.
Many important questions grow out of the-facts presented, and we shall proceed to notice suca of them as are deemed essential to a correct decision of the controversy. *
1st. Was the deed made by Hunter in 1810, to Sneed and Pleasants, founded on any valuable consideration, or was it merely voluntary and without consideration on the part of the grantor? We are of opinion that no valuable consideration passed to Hunter as an induce- *552 merit for ihe execution of the deed of 1810. It is not Prended that there is any such consideration, unless it can be .found in the ponion of his tyife which he received from her father’s estate. This cannot constifute an^suc^ conshlera(ion, because it is manifest that Hunter received his wife’s portion of that estate many years befo'-e the execution of the deed. He did not receive the money for the sale of the farm until afterWiirdsj but according ¡o the proof the farm itself was his from the date of his purchase in 1805. So that the 0uly rational inference from the testimony is, that he had reduced his wife’s portion to .possession before he executed the deed of 1810. Can the reception of an estaie by the husband in right of the wife,constitute a valuable consideration by relation to support a conveyance or settlement on the wife made years thereafter, when there was no ante-nuptial contract and no promise or agreement to make a settlement previous to reducing the wife’s'estaie to possession? We think it cannot. If it could he, there are but few married men who could nob when changes of fortune in after life might suggest the propriety of making family settlements, find valuable considerations in abundance, upon which to make ample provision for the support and maintenance of their wives and children, and by consequence, themselves, at the cost and suffering of creditors and their wives and children. See Roberts on Fraudulent Conveyances, 280.
... . ( to'trustees for use of the ■toe husband^ in consideration of propreceiVeTr^ hímkf right of his wife, will be contirv.ei vaun'
It is our opinion that the deed of 1810, from Hunter to Sneed and Pleasants, was voluntary on the part of Ihe grantor, and in this investigation must be treated as such. But may not Mrs. Hunter and her trustee Lyne, derive sorr>2 advantage in this controversy from the fact Biat her husband did acquire property of considerable value iíi her right by virtue of the marriage? Will no' *he chancellor protect her in her present attitude just as soon as he would, were the property now claimed by the bank, her original estate? The property in controversy-has been substituted, according to the answerof Hunter, in iicuof that originally owned by the wife. Can or does the law make any difference between property owned by the wife, and that which the husband may please to put in its place at any time.?
When, with-her,*the wife wiJÍ propabiy bo reduced to nor his ereA itorscan ob-wife’s estate without maMoprot-iiion by settlement for her and hcr chiWrep-
Ail voluntar,/ “om-eyarKvmiuio'by*'" cranttws v'hen oppressed bp debts, aro ineffectual to prevent antecedent creditors from subjecting; the property to the payment of their flehts
*553 The case of Elliott, &c. vs. Waring, V Mon. 338, and the cases therein cited, show, that neither a has-band nor his creditor will he permitted to obtain possession of the wife’s estate wit boat making a suitable provision, by settlement, for her and her children, when without it she would probably be reduced to want, The estate which Waring sought to subject to the payment of his debts, had been cast by descent on Mrs. Elliott subsequent to the period when the debts were contracted. In such cases, ¡is tiie wife's fortune has not given the husband credit, there is no hardship in cornpeliing a creditor to submit to a provision for the wi fe and children before he avails liimself of that, which did not and could not properly have entered into contemplation at the time he was extending credit. The present is not a case analogous to that of Elliott, &c. vs. Waring. The hank is not endeavoring to reach pioperty cast on Mrs. Hunter during the coverture, and which her husband has not reduced to possession. Instead of that being the ease, both Mrs. Hunter and the bank set up title to the property in contest, originating "from William Hunter. And if we wercto tolerate, the idea that Mrs. Hunters'claim was to be favored, regarding the property in contest as substituted in the place of that once owned by her, the establishment of such ¡i doctrine would operate as prejudicially to the inteiesb of society, from the facility with which sub-si it utos of property might be made, as that intimated as likely to result from tolerating considerations by relation. Mrs. Hunter’s portion of her father’s estate, ■and the attempt to connect the property in contest with it in the nature of a substitute for it, has no operation in her behalf in the present controversy.
yd. The next inquiry which seems to be proper is, whether the deed of 1810 executed by Hunter to Sneed ■ and Pleasants, passed the interest of Hunter, he it legal or equitable, to the trustees for the use of Ids wife, or whether that deed should he considered as fraudulent and void in consequence of ilimler’s irt'/c&fcdnm at the time of its execution.
It may he safely laid down as a correct rule at com-.-non law, as well as under the statutes of 13th and 27th Elizabeth, and our statute of frauds, that ill voluntary conveyances made bv grantors at n time *554 they were oppressed by debts, are ineffectual to vest, property in the grantee so as to prevent antecedent creditors from su bjectiug it to the payment of their debts; provided, the property conveyed or transferred was of that description and character which the law made liable to the payment of debts, had the conveyance never been made. In relafion to such conveyances as these, the rule of moral honesty is the rule of law': You must be. just b fore you are generous,
Subsequent creditors cannot overreach a voluntary conveyance, unless they cansh-w that they have been defrauded within the operation of the statute against fraudulent conveyances.
It is the intent and purpose with which the grantor acts, which renders the conveyance fraudulent un der the statute.
Rut the same doctrine does not apply to the same extent as it respects subsequent creditors. These have no cause to complain of voluntary conveyances, and cannot overreach such conveyances, unless they can show that they have been defrauded under the operation of the statute respecting fraudulent conveyances. That statute may be found in I Dig. 617, and contains in substance the provisions of the statu ms of 13th and 27th of Elizabeth. Indebtedness at the time of executing a voluntary conveyance is a fact from which the fraudulent “ intent or purpose to delay, hinder or defraud creditors^” &c. may be inferred.
It is the intent and purpose w'ith which the grantor acts that characterizes the conveyance and renders if fraudulent under the statute. Conveyances when a -man owes are not prohibited;but conveyances with the “ intent or purpose to delay, hinder or defraud creditors f &e. arc declared void, except so far as they may affect the grantor, his heirs, &c. Indebtedness to a large arnounl in proportion to the value of the grantor’s estate, might no doubt authorize the conclusion,in many cases, that his intent and purpose, were fraudulent. There may' be cases, also, where the grantor owed nothing at the lime, and yet he might execute a voluntary conveyance, which, under the statute, should be declared fraudulent in respect to creditors. For example, if a man settles on his family all his estate, intending to venture on a large speculation upon credit, attended w'ith great hazard, by which he will either make a large fortune or lose one, with a view, in case he should fail, to preserve what he owns from creditors, and keeps such an arrangement a secret until his rain is accomplished, we should not hesitate to pronounce ■such a conveyance, under the statute, a fraud upon *555 creditors of the blackest character. For an authority on this point, see II Atkins, 481.
A person in debt or out of debt may make a fraudulent convey anoe.
When, from all.the circumstances oí a case, a fraudulent intent on the part of a grantor in _a voluntary conveyance is perceptible, the conveyance will be pronounced void, whether the grantor was indebted or not Deeds of trust ncód°no^abeS actually recorded within alter"uaTr*18 date- it*is enough under our statutes cesif^heyaro proved or ackaowledged, 'wiih °thfclerk to be recorded,
*555 Fraudulent conveyances may be made, whether the grantor be or be not indebted. It must depend on the degree of debt, connected with all the other circumstances which are made to appear in any case, whether the court should or should not pronounce the conveyance fraudulent under the statute.
If, from all the circumstances, the court perceives a fraudulent intent on the part of the grantor, whether he was indebted or not, the conveyance must be held and considered as utterly void. It will not do to say, that because the grantor owed 1,5 or 10 dollars at the time he executed the conveyance, it is fraudulent, and therefore utterly" void. With these views the case of Taylor vs. Eubank, III Marshall, 241, coincides. There is no evidence showing how much William Hunter owed at the time he executed the deed of 1810. Whether $ 10 or §1,000 we know not. There is no evidence upon which we can found a conclusion that he intended, at the time, to defraud those who might thereafter become his creditors in case his business or speculations did not prosper. There is no evidence showing that a single debt existing at the time remains unpaid. Elis schedule, acknowledging that he owed, says he had enough to pay his debts independent of the property conveyed to Sneed and Pleasants; and the fact that none of the debts then existing remains unpaid, proves the truth of the statement. Therefore, we have reached the conclusion, that the deed of 1810 was not fraudulent in consequence of the grantor’s indebtedness, and that it passed the interest of William Hunter to the trustees for his wife’s use.
3d. The next important inquirypvhich seems to arise,, is, has the deed of 1810 lost its efficacy in respect to the bank, because it has not been recorded? Is it on that account to be postponed to the claim now relied on by the bank? Deeds of conveyance, to be good “against a purchaser for a valuable consideration not having notice thereof,or any creditor,” must be acknowledged by the party, or proved by witnesses, “ in Ihe of fice of the clerk of the court of appeals,” &c. within eight months after sealing and delivering," and be lodg.ed with the clerk to be there recorded.” I Dig. 312.
*556 J I, was decided in tbe case of the Bank of Kentucky vs. Haggin, I Marshall, 306, that it was not indispon-siblc lo have a deed of trust or mortgage actually ro-corded within eight months after its dale, but that ac-fr^vkdging or proving and lodging the deed with the derk to be recorded within the eight months, was a compliance with the statute. It is contended on the Pai’t °f the appellants, that the law in this particular hath been complied with as it regards the deed of 1810, because the deed was delivered over to‘A. ‘Sneed, then clerk of the court of appeals, after it had been executed in his presence. We think otherwise, Sneed was himself a party to the deed. I le and Hunter acknowledged the deed before the subscribing wit-Pesses> an¿ it was delivered to Sneed. But whether the delivery was to him, because he was one of the grantees, for safe keeping, or as clerk “ to be recorded,” is left (since Sneed’s deposition is rejected,) entirely to inference. But, in our opinion there was no such acknowledgment made by Hunter as would have justified Sneed, as clerk, in recording the deed. He may have seen Hunter sign and seal it, and may have heard him acknowledge it before others as witnesses; but that is a very different thing from the official transaction, which the law requires to take place when the clerk receives the acknowledgment of the grantor touching the execution of the deed, or takes the testimony of the subscribing witnesses, by administering to them an oath. It may be said that the spirit and intent of the statute is complied with, when the clerk knows that the grantor has executed the deed, and that it cannot be material as to the particular manner in which his knowledge is derived. To this wé answer, that a clerk is not obliged, by official duty,to receive and act upon deeds or other papers, unless they come in the channel prescribed by law; and as the deed in question was not acknowledged or proved before Sneed, in his capacity as clerk, he had a right to treat it as a private paper delivered to him as grantee, and- to record it thereafter, by procuring a regular acknowledgment or the proof of the subscribing witnesses, or not, as he might think proper. As it never was recorded, nor acknowledged, nor proved in the manner prescribed bylaw, we- cannot infer that it was lodged with him, as dork, to be recorded, when we perceive a strong in *557 ilucemcnt for lodging if with him, as lie was one of the grantees. If Sneed was bound lo receive the acknovrlodgment of the deed by Hunter before the subscribing witnesses, as a proper acknowledgment before him in his official character, we see nothing to prevent clerks from recording deeds whenever, as bystanders, they may see them executed at any place in the state, although the parties may not kuow him to be eleik, and may have no thought at the time of acknowledging the deed before him, as de¡k. We believe the legislature never intended to allow them such latitude.
Again, the conditional acknowledgment of the deed of 1810, for record, made by William Hunter in March 1810, as endorsed on the deed, is evidence that no previous acknowledgment had been made before Sneed in his-official character, if there had been, why was it not noted on the deed as is usually done? The conditional acknowledgment of March, 1810, reserving the power lo revoke the acknowledgment, cannot avail the appellants, because we take the fact of William Hunter's advertising and offering to sell the properly in July thereafter, as his own sufficient evidence of a revocation. Besides, there are other reasons why this conditional acknowledgment made in 1810, cannm give validity to the deed.
It follows, that the deed of 1810, is not good against the hank,provided the bank is shown to be a purchaser for a valuable consideration, not having notice thereof. The appellants deny that the bank can be regarded as a purchaser for valuable consioeration, and they also insist that the bank had notice of the deed of 1810, be fore its claim originated These positions must, therefore, be inquired into. The deed executed by William Hunter in 1819, to fl. Blanton, Ac. in trust for the1 benefit of the bank, shows an ample and valuable con ^deration, upon which, to support their purchase, pro vided that deed can operate as evidence in the cause.. But that is denied. It is said not to have been recorded in proper time, and there is no other proof of its "execution than the authentication of it as a recorded deed. Nor, is there any proof of consideration except that which arises from the face of the deed and William Hunter’s answer to the hill of (lie complainant.
Clerks have no power to receive proof or take acknowledgments of deeds, after the expiration of the lime within which the law requires the proof or ac knuwledgment to be made.
Tf a clerk receive proof or take an acknowledgment of a deed after the expiration of the time within which the law requires the proof or acknowledgment to be made, his certificate is not evidence ol its execution.
When from a memorandum endorsed on the deed and other evidence, there appears to be a mistake in the clerk’s certificate relative to the day on which the deed was proved or acknowledged before him, the mistake ought not to prejudice the rights of the parties to the deed,
*558 It is well settled, that clerk’s have no power to receive proof or take acknowlegments of deeds, after the expiration of the time within which the law requires it to be done. Womack & Wilson vs. Hughes, Littell’s select cases, 295. If tbey do, their certificates are not evidence of the execution of the deed. The deed of trust executed by William Hunter to Blanton, «fee-bears date, 19th October, 1819. As the law then stood, it should have been acknowledged or proved, and lodged with the clerk for record in eight months thereafter. Lees, the clerk, slates in his certificate upon the deed, “that the within deed was produced to me in my office on the 19th of October, 1829, and was acknowledged by William Hunter,” «fee.
Now, if the deed was not produced and acknowledged before that, it is conceded that the eight months had expired, and that there is no evidence before us, so.far as the appellants are affected by it, which shows that William Hunter ever did at any time convey the property claimed by the appellants to Blanton, «fee. in trust for the bank.
But if it be manifest, from any thing as evidence in the case, that the insertion of 1820 in Lee’s certificate, is a mistake, and that in truth, the deed was produced and acknowledged before him, and lodged for record within the eight months, then the law lias been complied with, and the mistake of the officer ought not to prejudice the rights of parties. We are of opinion, that the insertion of 1820 is a mistake on the part of the clerk, and that it should have been 1819. This mistake is manifest by the endorsement or memorandum upon the deed, (which it is believed clerks invariably place on deeds when they are acknowledged oí proved, whereas, the certificate is not made out until after the deed is recorded,) shewing that Hunter and others acknowledged the .deed the day it bears date. It was not recorded until after the acknowledgment of Todd, which did not take place until September, 1821; and, this delay in recording and making out the certir ficate, may well account for the blunder committed in inserting 1820, instead of 1819, which the memorandum proves to be the true date. Does the delay of Todd and Pearson to acknowledge the deed until af ter the expiration of the eight months, effect it so far *559 vis the grantor and grantees were concerned1! We think it does not. Todd and Pearson, and the other parties of the second part united in the execution of the deed, for the purpose of shewing that they would claim no exoneration as sureties for Hunter, in consequence of the arrangement. They parted with no title, they accepted none by the deed. It was perfect for all the purposes of conveying and passing the title without them. The grantor and grantees of the title, acknowledged it on the day of its date in the clerk’s office, and it was left there for record. It answered all the purpose of notice contemplated by the statute, and hence, we perceive no defect from the failure of Todd and Pearson to acknowledge it within the eight months. The deed of trust of 1819, with the certificate corrected by the memorandum endorsed, is therefore received as evidence. And we think it ought to operate against the appellants, so far as to shew that the bank stands in the attitude of a purchaser for valuable consideration, without further proof. It is prima fade evidence to the world, that William Hunter conveyed the property in the deed described, so Jaras he had title to convey, for the consideration expressed. Had the bank such notice of the execution of the deed of 1810 by William Hunter, as should have induced, it not to accept the deed of 1819 to its trustees, or such notice as would subject the bank to an acquiesenceinthe operation of the former deed? A corporation cannot receive information or notice of any fact, but through the senses of the members composing the corporation. A corporation, according to the quaint saying of lord Coke, has no soul; but its movements and operations proceed from intellection, and that very often of the most accute and penetrating kind. The corporatemind, so to speak, is the focus where the intellects of its managers are concentrated for the transaction of business. The charter of the bank of Kentucky requires at least five directors to constitute a board, and a majority of the board direct the affairs of the institution, it is the union or assent of the minds of the majority to any one thing, and so ordering it, which constitutes an acc of the corporation; and consequently, we areno!, willing to say where the law has prescribed no particular mode of giving notice, that the knowledge of any fact by Jess than a majority of the hoard will amount *560 to notice oi’ that fact on tbe part of the corporation. Tin: law in regard to deeds has prescribed how all the , v orld shall be notilied of them; and it, may well be doubted whether a corporation can receive notice in any other manner. We shall not settle this question definitely now, because it is unnecessary; our opinion being clearly against the validity of the notice relied on, upon other grounds. The notice which Sneeu had of the execution of the deed of 1810, and the fact of his being a director of the bank in 1819, when the deed by Hunter to Clanton, éc, was executed, connected logo!her, constitute all the notice which the bank, or ils directors ever had of the existence of tbe deed of 1810. Wc have already intimated that the knowledge of one director alone is insufficient. He may noi. lie present w-ien the hoard determinen to accept a conveyance for the property, which he may know has been previously conveyed to another, ¡lis absence muy be without fault on his part, and since his knowledge was acquired, he may not hav e had an opportunity to communicate it to any other director. Must the corporation loose under such circumstances, when the law has not been complied with, which prescribes the rule for giving notice by recording the prior deed in proper time? But suppose the director to attend, and from some motive worthy or liase, no matier which, he conceals his knowledge from the board, shall the secret locked #p within his own breast, vitiate an act oi' tile majority done in good faith? But we will pursue this course of remark no further. However we may-think proper ultimately, to decide the effect of notice io one director, we are confident that notice to one will never be regarded by us as notice to the boarcl., when that one is in,crested in protecting his own title by not, communicating his knowledge to the boarcl. It is contended that Mneed’s knowledge of the deed of 1819, he being a director in 1819, makes the deed oi 1810 good, althouga he may have concealed his knowledge of that deed. Lot it bu remembered that he was a party to the deed of s8L0, and as the surviving trustee held the title in Í819* Now, under these circumstances, his silence upon that subject should have a direct operation against his title, rather than to favor it. If would have been a direct fraud on iris part, to stand by hi silence as a director of the bank, and permit Win, *561 Hunter to convey to Blanton, &c. trustees for the bank, property which Hunter' had previously convejed to him. In such a case, no- consideration could protect Sneed from being compelled to surrender the title, Hid he not act and hold in the character of trustee. It would be his duty in such a case, to make known to ihe whole board, that the property had already been conveyed to him. Ifdoes not appear that Sneed made any such communication. We are, therefore dear, that the bank as a corporation, has not had such notice of the existence of the deed of 1810, as will weaken its claim under the deed of 1819, to the property in contest, the title to which, according to the deed of 1810, was in Sneed, the director, and the only one who had any knowledge of the existence of that deed when the*bank’s claim originated. The conclusion from the foregoing view of the controversy, is very obvious, if wo regard William Hunter as possessed of the tillo at the time he made the deed to Sneed and Pleas-ants in 1810. But if he was not, if at that time he had only an equitable interest, the counsel for the appellants contend that it presents the controversy in an aspect entirely different, and may lead to a very different conclusion. This renders it proper that we should, i nquire into the situation of the legal estate, which we shall now proceed to do.
?*olico to une ilireoiorol'tbo Bunk of Ky. will not bo ro^a riled asnotico to tbe board, if that director bo interested in protectin'; his own title by not communicating his ■cnowledgc to ■lie board of drectors.
*561 4th. By an act of the legislature-of Virginia, passed in 1786, the title to lots in Frankfort was vested in trustees. See III Litt. Laws, 557.
The trustees were directed by the act to proceed and sell the lots within six months, such lots as had been previously disposed of by James Wilkinson, the pro* prietor, excepted. Whether the lot in controversy was embrace! by the exception, we have no means of knowing. Taking it for granted that it was not, which is the most favorable light in which it can be viewed for the. appellants, then it may be safely affirmed that the legal title to the lot in controversy, remained in the trustees -of the town until divested by their conveyance.
There is no evidence in the record to shew that William Hunter ever had any title -derived from t ,e trustees of the town of Frankfort. All the evidence relative to the disposition of the title made by toe trustees o.f tne town, shews that-they have vested it in tue *562 ‘appellant Lyne, for the use of Mrs, Hunter. The deeS from the.town trustees to Lyne, contains recitals, from which it appears that William Hunter’s title may be. traced bucle, by deeds reg darly executed, to James Wilkinson, the original proprietor of the town, who executed a deed purporting to pass the title to John Gano, in 1791.
Jinng atttf undisputed JJOf.umsiov of any riphtorpropcríy ereatos a lh¡Tt¡ít hm!t legal foundation.
haw lwcn ’ij* presumed. Rather than disturb moil's possessions,» even n-ooi'djL
Less t ban twe-ty yours posws too ivill not oren to a presumption of title to real (State.
Tenants or lessees cannot gainsay title in their landlords..
There is no deed from the trustees of the town to Wilkinson exhibited or spoken of, and unless the facts presented by the record, will justify the presumption - - - ,. M1 . ^ that such a «cod was executed* it wilt ioiiow* that vYm. Xfunierat the time he made the deed in 1810, had no mere than an oquiiable interest in the lot. “Long and undisputed pos-cr-sion of any right or property, alfords a presumption that it had a legal foundation; and rather than disturb men’s possessions, even records hyve been presumed.” Peake’s Evidence, 22.
This doctrine is abundantly established by almost every trea-.bc on evidence, and has been recognized in many adjudged cases. It would be vain parade to refer to them. But there is no case of which we have title ¡o real estate has been any knowledge, where title io premmed from possession alone, short of twenty years, Wdliam. .lu.nler had not ¡toon twenty years in possession, who n he executed the deed to the trustees for the bunk. 'There is no evidence that those under whom he claimed, (according toihe recitals in the deed made by t ie t'Uiteesof Prankfort to Lyne,) were ever possessed by actual occupancy. Moreover, the evidence of the existence of the deeds from Wilkinson down to William Hunter, consisting entirely in recitals contained in the deed to Lyne, is of very doubtful character, if admissible at all, because it is not shewn that the deeds referred to have been lost, or some other satisfactory reason offered for not producing them or authentic co-pies. See Peake’s Evidence, 3.
Wc are therefore of opinion, that William Hunter must be regarded as possessing no more than an equitable interest, if that, unless he and the appellants are estopped to deny his title. That William Hunter cannot gainsay, or deny he had title, is too clear a proposition to require argument. In relation to the appellants, it is a question of some difficulty. Tenants orlcsseescannot title in their landlords. In *563 case of Connelly’s heirs vs. Chiles, II Marshall, 213, it is said to be “a settled rule, that he who otilara under another is estopped to deny or controvert the title of him under whom the possession was acquired;” and in-McConnell, &c. vs. Bowdry, &c. IV Monroe, 409, it is shewn that a tenant cannot deny the landlord’s title, where the tenant was possessed befo -e accepting ¡he lease. Á defendant¡nejec¡.ment,cla'raingl;:eland by ex-ecutory contract,is estopped to deny the plaintiff’s title» and will not be permitted to protect Ifmelf under an elder outstanding title. Hamilton vs. Taylor, Litt’s, select cases, 141. Parties claiming from ¡he same source, are not to permitted to corniest its validiiy, and to protect themselves by shewing, an ontsumding title in others. McLean vs. Gregg, II Marshall, 456. -If the trustees or the cestus qus trust. Mrs. Hunter, can he considered in possession under the deed of 1-S10, and that deed passes no more-than an equity, it constitutes no protection against William Hunter-or his'vendee in an acdonof ejectment, acco -ding to the principle setded in the case of Hamilton vs. Tavlor; and an outstanding title in another, or an attempt to claim title-through others, will not avail. Mrs. iJunior and.her trustee, Sneed, claiming under and from-the same source with the bank, to-wit: from Wilham- Hunter, cannot deny Ms title according to McLean vs. Gregg; and therefore, it seems to follow conclusively, that they are estopped to deny William Hunter’s title. William Hunter being regarded then as having.the title, by applying the doctrines qf estoppel, and having parted with it to Blanton, &c.. as trustees for the bank, without their, or the bank having notice of any outstanding -equity at the lime, and the bank- through her- trustees, being-purchasers for valuable consideration, it results that the bank must he protected against the-equity of Mrs. Hunter, derived under the deed of 1810. But it may he said that the deed of 1810, being absolute upon its-ze as passing the title, like the case of Winlock vs. Hardy, IV Litt. 274, should be-rejected as not evidencing an executory contract, so as to bring this case within the operation of the principle of Hamilton vs. Taylor. It is true, that the deed of 1810 is absolute, and purports on its face to be a perfect conveyance, and is not Such an instrument as would justify the-opinion from inspection, that an equity merely- passed by it. But if *564 we regard it in the light of a perfect conveyance, theft it ought to have been recorded within eight months, or acknowledged or proved, and lodged for record. To avoid the necessity of having it recorded, the appellants coerase} .nsist, that it only passed the equitable title, and should not be regarded as a le|al conveyance. If they are right in this, then we give to it all the consequences of an instrument passing a right to coerce the legal title, and therefore, in its operation and nature, it cannot amount, to any tiling more than an ex-ecutory contract. 4nd let it be considered, either as an executed or executory contract, and debar the appellants from taking it to he one and (he other, as will best suit circumstances, and coniine them to regard it' in one point of view only, the result will be unfavorable to them, let them choose either horn of the dilemma. The case of Winlock vs. Hardy, is unlike the pro sent in many important particulars. Wmlocfc claimed the land in virtueof a purchase aisheriii’s sale, under an execution against Isnam Hardy, and offered in evidence a deed from Isham Hardy to James G. Hardy, the defendant in tile ejectment, with a view to conclude the defendant as to Isham Hardy’s tille. The court decided it was the deed of Isham Hardy “only, by-whom alone it was executed, and not bring'the deed of the defendant, it cannot op rat:: as a deed to estop him from-denying that the, grantor had titled'' Not so in this ca-e. Here the deed is executed by the gran.eos, Sneed and Pleasants, as well as the grantor William Uunler. The grantees are estopped by their own deed, fo deny that Hunter had title, and Mrs. Hunter is hound by the estoppel which operates on her trustees. “Estop-pels preclude a party from shewing the truth; but they subserve the ends of j ustice, and for that purpose must ofien be allowed.” The effect and operation of the estoppel in this case, excludes the right of Mrs. Hunter and her trustees to insist on a regular derivation of title down to William Hunter, or to shew th¡j$k be had no such title, or to set up an independant title acquired through him.
There are yet other views of this case, which are equally forcible in favor of the claim of the bank. Owing to the importance of the questions involved, we shall brieiiy present them. In the case of White’s *565 heirs vs Prentiss’ heirs, &c. III Mon. 516, it is laid down,in the opinion delivered by the late judge Mills, to be ‘-a rule too well settled at this day to be questioned, that the assignee of an equity, takes it subject to any equity against it in the hands' of others. If that opposing equity is in the hands of the original grantor of the equity assigned, the rule is indexible.'’ in support of this rule II Ver. (59-7ÍÍ4; I Peer Williams, iiXS: I Vesey, l!¿3, are cited. But to this rule an exception is found in the case of Muncy, &c. vs. Lilburn, &c. II John. Ch’y. Rep. 441. Suppose wc were to concede then, that Mr-. Hunter and her trustees, were not estopped to deny title in William Hunter, and that Blanton, ice. are not purchasers, because the deed of 1819 did not vest them with a complete legal title, how will the case present itself? It will then come in the attitude of conflicting equities; Mrs. iiuuter’s.the oldest, but voluntary; the bank’s the youngest, but founded on a valuable consideration. Which shall prevail? A buys a tract of land from B, but takes no title, and •contents himself with a title bond. A takes possession of the land, makes valuable improvements upon it. His contract with B, and bis ameliorations are notorious. He gives C an obligation or promise, without consideration, to settle the land and its improvements on A’s wife and children, through the instrumentality of C as trustee. Thereafter A gives I), who is ignorant of the promise to C, an obligation io convey hirn, D, the title for a valuable consideration, A continuing to exercise every act of ownership over b c property. advertising it for sale,<fec. After ail this is done, whose equity shall prevail, C’s or D’s? We answer that of the latter without hesitation. Ex nudo pacto non oritur actio, is the maxim which we think the chancellor should apply to the contract between ’land C, in such a case. It should be considered^a nullity when brought in competition with the rights of D, the subsequent equity holder, who may have, paid A, now insolvent, for the land.’ This supposed case is, in principle, analaguos to that before us* Bulsuppose 1), believing the title tobe in A, should bring a suit in chancery for a specific execution of his contract, and pending the suit, A and his wife induce B to make the title to .«'1 for the wife’s use, without any consideraron, and .3 and E a'-e well informed as. to the claim of I); shall E now hold the property *566 and defeat I)?' We think the moral sense of every maH unhesitatingly answer no. The contrivance-of A and his wife, and B’s acquiescence in conveying to E, cannot in conscience prevail. An apology,in such a case, may be found in the apprehension and foreboding of want and penury entertained by A and his family, satisfactory to them. Their motives may be such as would influence all to act precisely in the same manner similarly situated, and therefore, may deserve the most chari I aide consideration and exemption from reproach. Nevertheless, the best interests of society are opposed to the toleration of such conduct, it would lead to theiutliclion of injuries, and the perpelralionof frauds on the innocent, which could not be guarded against,and must, therefore, be condemned. Equity considers that done,which ought to have been done, in the case put, A ought to have received the title,, his failure to do so, his instrumentality in procuring B to make the title to E, acting as agent for E’s cest.ie que trust, cannot be received in any other light than as a fraud upon the rights of 13, on the part of all concerned in it, E having obtained the title when the equity of A, who paid ihe purchase money, was complete, and when A ought to have had the legal title. E having-paid nothing, but acquiring the title through A, and in consequence of the equity vested in 4, ought to be regarded as accepting tbe title in trust, for the benefit of A’s vendee for valuable consideration. It is needless to make a direct application of these doctrines to the case before us. The analogy is sufficiently obvious.
But again, the case of White’s heirs vs. Prentiss’ heirs establishes the doctrine that the trustee holding an equity, may, by his conduct, destroy that equity to the prejudice of the cestue que trust. What has Sneed, the surviving trustee done-in this case? According to the view of his conduct taken by theqyippellants, he has stood by and permitted. William Hunter to convey the equity vested in him to the bank, and consented to it. If he did so consent, it was a waiver of his claim, according to the case of Mosby, &c. vs. Trimble, &c. If he informed the directors of his claim, and still acquiesced, and consented that Hunter should convey to the bank, it was a waiver of his equity. If he was silent, then we will constrain him and hisccstue que trust to be silent now. See Rob’ts. Fraud. Con. 528.
jjusl i]Cproof in the record thegenuwritten°ao^ knowledgFeut of seron aswLffi»». ■
We have intentionally avoided all commentary upon the decis.ons of the English combs, in relation to their construction of the statu tes of i'ilh &;'27th of Elizabeth, and to which our attention has been called by the argument and briefs in this case. In the labyrinth of •English adjudications on the subject, we are inclined to think that some of their judges have gone further in considering and declaring voluntary conveyances void under their statutes, than the policy of this state, as ■manifested by its statute, requires or sanctions. Nor are we prepared to say that there is any well founded -distinction between the attitude of creditors and purchasers as affected by the operation of the statute of frauds. On these heads, we wish to remain uncommitted, until a case presents itself, which cannot be decided without disposing of, and going into them thoroughly. The present case may be decided against the appellants without establishing the doctrine, that every voluntary conveyance is utterly void as it respects subsequent purchasers, whether with or without notice;.
It is our opinion that the circuit court did not err in 'holding the property in contest liable to the payment of the demands of the bank.
There are some minor points which we will now pro-need to examine, in winch, according'to the assign•inent of errors,itis alledgedthatthecircuitcourt erred. it is objected, that the proper parlies were not before the court. This is true. There is no evidence of a competent character in the record, to siiew that Blanton, <&c. trustees for the bank, were served with, pro, cess. A writing purporting to be their acknowledgmen t of the fact, is not sufficient. IV Lilt. 268; I Mon 22; Ibid. 239. It is alleged the court erred in proceeding against Mrs. Hunter, without appointing some person to defend for her. This objection is entitled to no weight. See Clancey, chapter II. It is ■alleged that the court erred in not reserving Mrs. Hunters future and contingent right of dower, in case she .should survive her husband. The decree of the court could not affect that, because it was not in litigation. When the right of dower shall accrue by the death of the husband, Mrs. 'Hunter can then assert her claim without danger of being barred by any decree in this *568 cause, which only should subject the property to tire' paymeni. of the debts due the bank, and vest t ,c purchafer In case of sale, with the tillein fee simple discharged f om l. ■ e claims of Sneed and 1 .yne as trustees; and; for tnat purpose, a relinquishment of their claims should be decreed. Ml tnis may be done without affectuig Mis, Hunter’s right to dower, if she shall be eni.tied to any, and whether she will be, is a question it would be p-emauire to decide now. it is objected, that '¡or children should hare been made parties. To (his if may be answered, tiiat there is no proof she has any.
The doctrine of e.tnppd is "er in'the terrifuries of the chancellor Courts of equity will, whenever morality and justice, require it, estop an individual by written instruments as well as matters in pais, just as soon as a court of law will
Mills and Monro;, for appellants; Crittenden and' ‘1 '•JboL for appellees.
F'ponthewhol record weseebutthconc error,and for that alone Lx. dea ec is reversed and set aside, and the cause 'ornanded for now proceedings; and in case the-prone: parth sare not made in a reasonable !ime to be' given, the bill must be dismissed withoutprejudice.
The appellants must recover their costs.
Up n a petition for a re-hearing by the counsel for the op-' ¡j d'. '/its. the court grunted, it. And after a rr-argumenf. of ih . ousc, Judge Uhdemood delivered the opinion of ■ the court as folíolos:
The importance of this case to the parties litigant, and the inleies’ing questions of law involved, together wifi the sokciiude of counsel, “to preserve for a destitute bul amiable wife and children, the las* atom left for their subsidence, (to quo e from the language of .he petition,) coupled with an able argument, induced us to grant a re-hearing. We have maturely consideied the subject under all (he new light thrown upon it, and shall now dispose of the case, (leaving the original opinion as containing tire facts of the case and the decision of several points not questioned on re-argument,) by such additional r, marks, as we deem necessary to present it in i;s true character both in feet and law.
Upon the re-argument, three positions laid down in the opinion hcretofo.e delivered were, by the app-el{iUp.s’ counsel, thought to have been incorrectly decid- . e(^‘ Objections were also taken against minor points as laid down by the court.
If a person is silent when he ought to speak, equity will debar him from speaking when conscience requires him to-be silent. Person who enters under an 'xecutory contract is estopped to deny the title of his landlord or vendor. Where a person enters upon land under an executory contract and afterwards rescinds the contract, equity requires him to restore the posteriori. Vendee, who holds under an executed contract (so far it relates to the execution of the deed) and who rescinds the contract for fraud, ■will not be permitted, in resistance of restitution of possession, to set up an out standing title vvhich°hasnot Been acquired try him.
*569 We shall first notice the argument attains! that por Ron of the opinion which applies the doctrine of esto.pel to Sneed the trustee, and by consequence to Mr.-. Hunter, and precludes them from denying the existence of title in William Hunter. We will not consume time by inquiring minutely into the difference between legal and equitable estoppels. Although the proper use -of terms in all investigations, and particularly in those •pertaining to the Science of law is important, it is a ;matter of far greater concern, that the principle settled should condúcete the ends of-justice, and to the ¡peace and well being of society. The doctrine of estoppel is not a stranger in the territories of the chancellor, A court of equity will estop an individual by written instruments as well as matters in pais, just as soon as a court of law, whenever sound morality and justice require it. If a man is silent when he ought to speak, ■equity will debar him from speaking when conscience requires him to be silent. Roberts on Fraudulent Conveyances, 537-^, and authorities there cited. In the case of Bailey and wife vs. Duncan’s representatives, IV Mon. 259, this court applied the doctrine of estoppel ■as resulting from a deed of conveyance in a proceeding in chancery. The cases aré numerous to show the genera] principle, that a person entering upon land under another by executory contract, is estopped to deny the title of the landlord or vendor, and if the contract be rescinded at the instance of the tenant, equity will require him to restore the possession. Would the vendee, holding under an executed contract, (so far as •it related to the execution of the deed,) and who might .rescind the contract for fraud, be permitted to set up an outstanding title in another not acquired by him, and refuse to restore possession? Would the chancellor listen to his evidences of title in another further than they might show the fraud? He certainly would not consider them with any view to find grounds to protect the vendee in possession; but in all such cases would estop the tenant to deny the title, whether executed or executory, under which he entered, and compel him, upon a rescisión, to restore the possession which is itself something of value. Chancery will estop a party by matter of record, and by writings, as soon as a court of law, with this difference, the chancello!- affords facilities for their impeachment upon the ground *570 of fraud, mistake, &c. which a. common law judge will not indulge. Suppose Sneed had taken possession of the estate conveyed to him by Hunter under the deed of trust, and had received the profits, and thereupon the cestui (]ue trust, Mrs. Hunter had called upon him by bill to account, and he had refused upon the ground that the estate was ids? Would such a defence avail?' We think not. On the -CGntrarjr, his being a party to ^le deed, and binding himself to cgirry it into effect, should, in our opinion, estop and preclude him from setting up such a defence directly in the face of his own covcnan^ unless he could successfully impeach the deed of trust on the ground of fraud or mistake. Now, in applying the doctrine of estoppel to Sneed, and the cestui que tnr,t in the former opinion, we laid some stress, and we think properly too, upon the circumstance that Sneed had executed the deed as well as William Hunter. By signing and scaling, he bound himself to hold the title for Mrs. Hunter which her husband had placed in him for her use. If he had taken possession of ^he es(aie, it seems to us that he would have been es-lopped to deny, in any controversy with Mrs. Hunter, her title, and that he had derived it from her husaand. jn this controversy we gave the same effect to Sneed’s s^Sn‘ng an{l sealing as it regards the bank. We took his hand and seal as evidence that he claimed from the same source with the bank, and therefore applied the case vs. Gregg to that fact,
wil^esto^a' party'by matter óf record aud bywrias a court of-’ law, with this difference, chancellor af fords facilities for then- im-^ the ground of fraud, mis^ke, &c., xno'nltLw*0111 coi.rt will not indulge.
¿Tpartyto* aud has sign-trust and in estopped to deity thetitleof in«f virtue of it taken posses sion of the trust estate, will, in any controversy with cei-tui que trust, be
Wherever parties to any controversy admit that they c*alm toe same tiüe, or under rue same person, we can perceiv.e no reason for going farther back than to the source acknowledged by both as conferring their respective rights, if in this case Sneed and Mrs. Hunter had merely exhibited their deed of 1810, and said,in answer to the bill of the bank, “ wc claim the property under this deed,” 'it would not have been necessary to inquire whether William Hunter’s title was regular-derived or nof. The only question, in tiiat event, would have been which deed shall prevail, that to Sneed of 1810, unrecorded, or that to Blanlori, &c. of 1819, recorded. By the estoppel, which we applied td the case, we brought the controversy to the same point, and decided that the deed of 1819 should prevail over the deed of 1810. So far, we still think we were *571 'right. To bring these two deeds together and to weigh them, and to ascertain their intrinsic value by applying th-: standard of the law to the contents of each, and so to ascertain-.which is entitled to the preference regarding all the steps taken in respect to each, is a process against which we perceive no good reason in law' or equity. But, so far as the decision heretofore pronounced may have indicated a belief or opinion that possession taken by Sneed under the deed of 1810, would not have been adverse to William Hunter, or that Sneed or Mrs. Hunter could not in consequence of the deed of 1810, protect themselves by acquiring an independent title, it is erroneous.
Possession tuken un‘ler an tract is ad-”" verso to all the world; possession thus acquire'‘ be divest-sup-"4 posing the tenant to be tule under which lie may have entereii* ,
The authorities cited and relied on by the appellants’ counsel, do clearly and satisfactorily show', that possession taken under an executed contrac I is adverse to all the world, and that a possession thus acquired cannot be divested in a suit at law by supposing the tenant to be estopped to deny the title under which he may have entered. Under this .correction, so far as the deed of 1810 is relied on, it must be taken as an acknowledgment-of title in William Hunter, either equitable or legal. It would be preposterous to use it for any other purpose, and if it does not show one of these two things it proves nothing whatever, and should be laid entirely out 'of the case. Now, i f it proves a legal title in William Hunter, then it must give way to the deed of 1819, because it was not recorded in proper time. If it proves an equitable title in William Hunter, it must likewise yield to the deed of 1819, for reasons which will be assigned'; and if it proves neither one'nor the other, it can only show a desire on the part of William Hunter, at the time of its execution, to settle property on his wife and herchildren not owned by him, and'cannot operate in the cause, but will leave the rights of Mrs. Hunter to depend entirely upon the deed obtained from the trustees of Frankfort since the institution of this suit. There never was any possession of the premises under the deed of 1810. The trustees in that deed did not comply with a single stipulation on their part. On the contrary, William Hunter occupied the property and displayed every act of ownership by renting, advertising for sale,&c. which' it was possible for tbfe owner to do, while the, existence *572 of the deed of 1810, was unknown-to all but the parties, and the subscribing witnesses. Hence, the fact is clear, that there was no possession adverse to William Hunter, undér the deed of 1810 at any time. Without this deed of 1810,- as will hereafter be shown, Mrs.Hunter and her second trustee, Lyne, cannot possibly succeed. When this deed is exhibited as évidence of their right, it sets up a title of some sort derived from William Hunter, the common fountain from-which both-parties derive whatever rights they possess, when the deed from the- trustees of Frankfort is not considered. The estoppel, therefore, which we think applies against Mrs. Hunter with propriety, is this, that to tire extent which she relies on the deed of 1810, she must be considered as admitting William Hunter's-right,and to that extent she is estopped to deny his right; but this will not preclude her, from asserting an independent title, and if she can succeed upon such independent title, we will not destroy its efficacy, merely because she seis up an invalid claim under the deed of 1810. In order to be fully understood,, we mean this, that scrlong as Mrs. Hunter relies on the deed of 1810 tooperate upon others, we will regard it as conclusive-proof that she claims under William Hunter, so far as it relates to all the consequences which she would deduce from that deed, in aid of her claim, and to the-prejudice of others; and if from this conclusion, deductions of law force themselves upon-us unfavorable to her right, as derived under that deed, she must abide by them.
What was the attitude of the parties in 1B19, when William Hunter conveyed to Blanton, &c.-? He had-possession, always evidence of title, as this court declared in the case of Campbell vs. Roberts, &c. III Marshall, 623. He held under a deed with general warranty. Prima fade, a conveyance from him would1 pass the fee simple estate, and if it did'not, the quasi purchaser would still acquire something of value resulting from the previous, warranty. When-he makes a deed of convejwnce in'. 1819, founded on a valuable consideration, shall such deed be affected by the deed of 1810, never recorded, never acted upon by any party to il, and which was permitted to sleep in oblivion until the estate was about to be disposed of by the *573 chancellor under the deed of 1819? This question brings us to the reconsideration of so much of the former opinion as relates to the application of the statute of frauds to the case. On this head it is contended, in the second place, by the counsel for the appellants, that the court has erred.
In the opinion delivered, the court entered into an inquiry whether, the deed of 1810, was fraudulent in consequence of William Hunter's indebtedness at the time of its execution, and came to the conclusion that it was not- In a subsequent part of the opinion an analogous case is put, and unhesitatingly ‘decided against the party standing in the predicament of Mrs. Hunter and her trustee, Lyne. The opinion waives the question, whether there be any well founded distinction in our statute of frauds between creditors and purchasers. From all this the counsel for the appellants seem to think that there is shown some inconsistency in this, that we determine in the first place that the deed of 1810 was fair, and then turn about and pronounce it fraudulent; that we do not in terms recognize the distinction well settled in the-English chancery, between creditors and purchasers, growing out of their statutes of the 13th and 27th Elizabeth, and yet we in effect apply the distinction to the facts of this case and decide upon it, thereby giving the purchaser an odious preference over the creditor. It was certainly not our intention to run. into any such apparent inconsistencies, and- we think it can be made plain that we have not. In- disposing of the many points which presented themselves, they were taken up one by one. In this way it is -very obvious that the deed of 1810, might be regarded as fair upon one ground-and fraudulent upon another. We accordingly so considered it. Upon the score of Wm. Hunter’s indebtedness, we thought it fair. Upon the ground of Wm. Hunter’s continued possession, and the exercise of acts of ownership altogether inconsisten-, with the provisions of the deed, together with ti>e secrecy which seems to- have shrouded it, we thought it fraudulent, and when we came to take-another view of the subject, and to put an analogous case, we pronounced against it bv a direct appeal to the moral sense of every man.
All absoluto conveyances of goods and chattels when the possession remains with the grantor, are fraudulent Possession of land by th.e grantor after an absoluto conveyance does not, per se, render the conveyance ■fraudulent.
Conveyance of land, possession retained by grantor and the deed .not recorded within time, renders the conveyance auspicious.
But we are not without authority in support of fete view of the case. So far as we are informed; there has, been an unbroken chain of decisions ever since Froyncs’ case, determined ten years after the passage of the statute of 13th of Elizabeth, (see Robertson Fraud. Con. 545,) declaring all absolute conveyances of goods and chattels fraudulent, within the meaning of that act, where the possession remained with the grantor. The same current of decision has run in this state, in adjudicating upon our statute of frauds, which in substance contains and combines the provisions of both the 13th and 37th of Elizabeth. We admit that possession of lands, after an absolute conveyance by the grantor, is not per so fraudulent. Such possession of lands is not so strongly calculated to delude creditors and purchasers as the possession, of goods. In regard to. lands, before we trust upon the faith of them, we-may examine the recording offices and inquire into the title, and even call upon the party for an exhibition of his title deeds. Yet, notwithstanding all this, it is laid down in so many words in Roberts on Fraud. Con. 555, that44 possession of land after an absolute conveyance, is evidence of a fraudulent design, within the statute of 13th Elizabeth. And if this possession be accompaniéd with acts of ownership, the evidence of fraud under that statute becomes very hard to be resisted.”
In the case of Perine vs. Dunn, III Johnson’s Cha. Rep. 517, Chancellor Kent regarded a deed fraudulent when the possession of the land had not been delivered. He cites various English cases in support of the doctrine, and quotes the language of Lord Rosslyn to this effect: “ Where there is a conveyance of an estate, and possession is retained, towards all third persons, the person to whom-it is conveyed will not be-allowed to be considered as owner, nor will the ownership be divested.” Toescape the operation of this doctrine, we deem-it essential that the deed of conveyance should be recorded in compliance with our statutes regulating conveyances. If this is not done it is at least one ground-' of suspicion, and when connected with others,.as-in this case, may furnish conclusive evidence of fraud;. And even if the deed be recorded, and the vendee is permitted to retain the possession and enjoy the estate, it may,when connected with other facts, be a circumstance well worthy of consideration to show a combination. *575 between vendor and vendee, for one to hold the title, while the other enjoys the estate in fraud of creditors.
In this case, Hunter made an absolute conveyance; he retained possession; he exercised every act of ownership; he kept the deed a secret; it was executed with muco formality and parade of means to discharge existing debts, and this too, on the eve of a trading voyage in which much might be gained or lost; under such badges of fraud, we could not doubt if he had not been indebted one cent at the time of its execution. When, therefore, we regard the deed of 1810 as fair and unimpeachable upon the ground of his indebtedness, we byno means meantto say thatit was notsubject to the imputation of fraud upon other grounds, and so we thought we would have been understood in putting the analogous case. These grounds condemn the deed both under the statute of 13th and 517th of Elizabeth; and hence, it was unnecessary to enter into a discussion as ‘to the difference between creditors and purchasers. It is contended, however, that as it has been shown that William Hunter had not the legal till-, and only held an equitable interest not subject to execution, that the "doctrines which would have applied in case he had the legal estate, do not operate at all upon the case. We shall not now decide whether a person possessed of land as Hunter was, lidding adverse to all the world, under an absolute conveyance to him, does of does not, hold such an interest, as that ci editors might reasonably look to it. Nor shall we decide whether or not, if an execution were levied on land so situated, and it sold and conveyed by the sheriff to the defendant •in the execution as purchaser, the possessor of the land, could resist a recovery in an actionof ejectment,by showing that some flaw had been discovered in the chain of title, whereby if turned out contrary to his belief, that •his interest did not amount to a complete legal estate. However this may be, it would, nevertheless, be singular, that-acts, which would amount to a fraud incase Hunter had a complete legal estate, should lose their character and become entirely innocent, as soon as his interest can be reduced to the grade of a mere equity, •contrary to his own expectation.
Whether lands held under executed contracts are, or are apt subject to the payment of debts by sale under *576 execution, when there issome flaw in the chain of title,if is still clear, that they constitute a legitimate subject for contract, and such interest as the holder has, he may transfer to whom he pleases. Let it be granted then, that William Hunter had only an equity, he has undertaken voluntarily to part with it, both to Sneed, as trustee for his wife, and to Blanton,&c. as trustees for the bank. In our opinion, the same circumstances which would have rendered his deed to Sneed fraudulent, in case he had the legal estate, likewise render it fraudulent, considered in tire light of amere assignment of his equity, with the single exception of failing to record it; and that the bona fdz assignee of the equity, upon valuable consideration, may rely upon those -circumstances to destroy all pretence of equity in Sneed's hands. But we go further, and even granting that the equity is uncontaminated with fraud in tile hands of Sneed, yet as it is based upon a good consideration merely, we say that the claimant of the same equity, whose claim is founded upon a valuable consideration, although it be subsequent in point of time, shall prevail. At this position, the counsel for the appellants seem to he startled, and defy the production of authority in support of it. Newland in his chapter on the “consideration of a contract,” says, “It is material on this subject of the consideration of agreements, to observe that there is a distinction between the cases where the question is merely between parties to the contract, and those in which the interests of purchasers, orof creditors are concerned, for it seems that equity will not, to ¡.heir prejudice, enforce any voluntary agreement, however meritorious its consideration may beSee Newland on contracts, page 79, and the authorities there referred to. Roberts on Fraud. Con. 478, says, “a court of equity repels a voluntary bond from its rank, and postpones it to ■debts up,on valuable contracts.” t gain, in pages 479-80,he says, “In actions against executors, the question of fraud within tho stature 13th Elizabeth, upon voluntary and collusive obligations is sooner matured; for as the executor may, in some cases plead an outsi and* ingbondin answer to actions upon the debts of bis testator, an occasion is then afforded to the bona fide creditor, to controvert the verity and honesty of the contract on which the the pretended obligation was grounded. But the contending claims of creditors upon vol *577 ■antary and valuable debts and obligations, as they are generally implicated with matters of discovery and account, are, as before remarked, usually agitated in courts of equity, where a rule very favorable to justice is tenaciously observed of postponing all voluntary instruments, however binding in their nature, to debts arising upon honest and valuable considerations.” These positions of these respectable authors seem to be fortified by the cases referred to by them, and have a •direct application in principle to .the present controversy. It is to be remarked, that there is no discrimination made by these authors as to the time of the accrual of the debt or contract, founded on a valuable ■consideration. Whether it be before or after the voluntary agreement, however mcritbrious its consideration, seems not to have made any impression as a matter of importance. Now, if all voluntary agreements are to •be postponed to a bona fide, debt, why not postpone ■them to a bona fide- contract for the purchase of real estate? The reasons seem to us to'be as strong for the one as the other. It will do just as much injury to loose the land contracted for, as it would io loose a debt of Us value. We are, therefore of opinion, that if the deed of 1810 was altogether fair in every respect, asj it is shewn to be good for nothing, more than to pass William Hunter’s equity, and as it was purely voluntary, and founded on no valuable consideration, it must yield in this controversy to the claim of the bank founded' on a valuable consideration. But it is contended that the bank is not in a condition, either as creditor or purchaser, to assert a right to the property, and we are referred-to the cases of Gilpin vs. Davis, II Bibb, 417; and Campbell vs. Mosby, Littell’s Select Cases, 358, to prove that a purchaser must be of the legal estate, and not of an equity. We grant that a purchaser “cxvi termini is one who has acquired the title,” and although in-this sense, the bank or her trustees are not-purchasers, still we are of opinion, that the bank may enter a.court of chancery for the purpose of asserting rights derived under the deed of 1819. In Gilpin vs. Davis,the court refer to Roberts on Fraud. Con. pages, 36 and 235. In the first page, it is said, ^though the purchaser be not deceived, a voluntary conveyance may still be fraudulent, and if so, it is consequently void as against him, if he completes his our- ' *578 chase; and the completion of his purchase by an exec'u-b ec* conveyance is necessary, to qualify him under the statute, to avoid the first conveyance, &c.” Now suppose a fraudulent voluntary conveyance to be executed, and thereafter the grantor enters into a contract to convey the same land for a valuable consideration re- ■ ceived, and gives what we usually denominate a title bond, how shall the holder of this bond, (who is a purchaser according to the vulgar sense of the term,) obtain redress if his vendor be insolvent, and refuse to perfect the contract by actual conveyance? The same author in page235,furnishes the answer, “wherever the transaction, either with the first claimant or with the subsequent purchaser,is notexecuted by a legal conveyance, but on'e or the other of them rests in contract, or covenant, the case must necessarily come into a court of equity, since a court of law, while it stands in such a predicament, can give no judgment upon it, under the statute of 27ih Elizabeth.”
Prior equity founded upon a good consideration merely, must yield to a subsequent equity founded upon a valuable consideration.
-Voluntary abased on^ooi consideration merely, will to ¿ontraots* for the purchase of real ¿felonsidemtion.
A purchaser, ao-uiredthp1 title.
*578 When the parties getinto chancery, the vendor may be compelled to execute the contract by a legal conveyance, and thus place his vendee in a situation in which the cour's of common law will apply to the statute. 4nd if, as in this case, the vendor never had the title, the vendee has a right io pursue it in whose-soever hands it may be found, and extract it from them, ■provided lie can establish 'his equity to the satisfaction of the chancellor. This is the course.which has been taken, and we perceive -nothing, in the cases referred to, which militates against it.
As the deed of 1810, whether it be regarded as passing.-íhe legal title, or a mere equity, must yield for the reasons assigned to the deed of 1819, we deem it useless to enter into an agreement to shew that the vestíture- of title by the trustees of Frankfort, in Lyne,pending , .he suit against William Hunter upon no other ■consideration, than the equity of Hunter, and upon his procurement as agent for his wife, cannot betoleraied.
In the third pi tee, so much of the original Opinion ib assailed, as considers the conduct of the trustee .Sneed, as operating-prejudicially to tne interests .of his cestui que trust Mrs. Hunter. We deem it unnecessary now to settle how far the rights of cestui que trusts, can bc *579 prejudiced by the conduct of their trustees. Where a person has notice of the rights of the- cestui que trust, we are inclined to think that the trustee m no case can prejudice the right of the cestui que trust by contract with the person so having notice. But we shall leave this whole subject open, deeming it unnecessary to discuss it. For we are still of opinion that the hank had no notice of the deed of 1810. We think there is a wide difference between notice of protest, to the cashier of a bank, who by endorsement, becomes a party to a bill of exchange, and. which is regulated by mercantile law, and that-notice to a purchaser, or quasi purchaser, which is to be relied on for the purpose of shewing that the purchase was not made in good faith.
Since the re-hearing, the appellants have withdrawn that assignment of error, which questioned the decree of the court for want of proper parties. This having been done, the decree of the circuit court must now be affirmed with costs. Regarding as we do the deed of 1810, as having no influence upon the controversy, and looking upon the deed from the trustees of Frankfort to Lyne, as procured with full knowledge of the equity of the bank, by-Hunter as agent for his wife,- who stated at the time the nature of the bank’s claim, and who admiis the consideration expressed in the deed to Blanton, &c. it must be taken that his'knowledge and his admissions, coupled with his agency, and the fact of Lyne’s claiming subsequently under him, are binding on Lyne and William Hunter. This supersedes the necessity of making more direct proof, that the-consideration of the deed of 1819, was as therein stated, if it-were necessary to furnish it. There are several other considerations which shew that it was useless to make direct proof of the consideration of the deed of 1819 as therein stated. Its correctness has not been questioned by the pleadings, and it would be-indeed singular, if in a struggle like this, it would not have been done, if it could be in truth. AH the circumstances of the case shew that the bank is a claimant in good faith for valuable consideration, and that the appellants must have had knowledge of the fact.
. We deem it unnecessary to notice minor matters. So much of the former opinion as reversed the decision of the circuit court, is set aside, and the decree of the circuit court ig now affirmed with costs.