<div style="margin-left:left">Detinue.

Case 60.

Oct. 30.

The case stated.</div>

## Hopson *vs* Boyd.

APPEAL FOM THE TRIGG CIRCUIT.

*Lunacy. Contracts executed. Inquisitions.*

JUDGE MARSHALL delivered the opinion of the Court.

This action of detinue was brought in April, 1843, in the name of John Boyd, sueing as an idiot, by his committee, to recover two slaves which had been sold by Boyd in 1826, and for which a tract of land was conveyed to him in 1828, which was afterwards sold under an execution that issued on a replevin bond in which he had become security for his father. The cause was tried on the plea of non-detinet, and a plea denying the idiocy of Boyd at the time of his sale, which so far as it was material, amounted only to the general issue. The only

question made in the progress of the trial were, first as to the admissibility of an inquisition returned a few weeks before the commencement of the suit, finding that Boyd was then, and had been from his birth, a person of unsound mind, and that he had no estate; and secondly, upon the defendant's motion for instructions to find as in case of a non-suit on the plaintiff's evidence. Both of these questions having been decided against the defendant, and further evidence having been introduced, a verdict was found for the plaintiff, assessing the value of the slaves and $220 damages for detention. And the defendant's motion for a new trial having been overruled, he has brought the case to this Court.

1. With regard to the first of the questions above stated, the doctrine seems to have been settled in England, and to have been recognized in this as well as other States, that an inquisition finding the person named to have been of unsound mind from a preceding day, is admissible as evidence of his incompetency during the period indicated, even against strangers who were no parties to the inquisition. But it has not been held to be more than *prima facie* evidence as to the past condition of the person. And although as *prima facie* evidence it might be sufficient, in the absence of all opposing testimony, to prove the fact, it must yield to the force of opposing testimony. The principle of its admissibility against strangers, seems to be, that it is a public proceeding, had under public authority, and in which the public are interested; and that, therefore, all persons being, to some extent, interested and represented in the proceeding, all should in some degree, be bound by it. In England the character and effect of the proceeding, and especially in cases of idiocy, were such as that the King, by whose attorney it was instituted, had an actually beneficial interest in opposition to that of the supposed *non compos* and his relatives. And in the opposition of these interests there was a guarantee that either in the inquisition or in the traverse which was allowed, the truth might be fairly attained. But in this State, while the proceeding is instituted and conducted by the attorney for the Commonwealth, it is often set on foot by the friends of the alledged *non com-*

*An inquisition of lunacy is only prima facie evidence against strangers, and in Kentucky, is entitled to but little weight, unless it find the subject to be an idiot from birth.*

*pos,* for the purpose of having him placed as a charge upon the public, or for the purpose of overreaching, for their own benefit, his prior contracts. And although the Commonwealth is interested in the question as to the present and future condition of the person, she has no interest whatever in the question as to his past condition, except so far as the difference between idiocy and lunacy, and the consequent difference in the manner of keeping or sustaining the individual at the public expense may be involved in it. In this proceeding her attorney is on the side opposed to her pecuniary interest; and although the Court is directed by the statute, to appoint some proper person to attend or defend for the alledged *non compos,* this does not insure a representation of opposite interests, nor a fair adduction of the evidence where the question depends upon the testimony of witnesses. And as the Commonwealth has no actual interest in the past condition of the *non compos,* the inquisition would seem to be entitled to very slight consideration as to the past, and especially when it does not expressly find the *non compos* to be an idiot from birth.

In this case the inquisition does not find Boyd to be an idiot expressly, but that he was of unsound mind from his birth; and there was no other evidence before the jury in this case, which authorized them to find that he was an idiot, according to any definition of that term which we have seen. If, therefore, the right of recovery depended upon his having been an idiot at the date of the sale, we should be decidedly of opinion that although in the absence of all other testimony as to his condition, it might perhaps have been inferred from the inquest, that he was an idiot from birth; yet as all the other testimony showed that he had been a person of very weak mind, but not absolutely an idiot, the motion for a non-suit should, on that ground, have prevailed.

But as he had been regularly found to be of unsound mind, and had a right to sue by committee, his action should not be defeated on the general issue, by an incorrect discription of him in the declaration, if on other grounds he had a right to recover. He was a person even in 1826, of extremely weak mind, and the jury might

have found that he was then incapable of conducting a sale or other transaction of importance, and the evidence authorizes the assumption that any one negotiating with him would have discovered this to be the case. But does it follow that every contract made by him under such circumstances, however fair on the other side, and however advantageous and even necessary for him, is subject to be defeated at any distance of time, or at the will of a committee appointed seventeen years afterwards, merely on the ground that he was not entirely competent to the management of his affairs when he made the contract? It was proved by the father of Boyd, that the two slaves, when sold, were very young, one under ten years of age and the other much younger, and the latter of such delicate health that it was doubtful whether he would live to be of any service; that they were sold for a fair price; that the purchaser would not consummate the contract without his (the father's) approbation; that he did approve and that a tract of land on which he, with his family, afterwards lived, his son residing and working the land with him, was conveyed to the plaintiff by the purchaser, in discharge of the price of the slaves, and was retained until sold under execution as above stated.

The question then is, whether, upon these uncontroverted facts, and without any evidence tending to prove fraud, or even inequality in the terms of the sale or any circumvention whatever, and in the case of a contract executed on both sides, the committee of the one party long afterwards found to have been *non compos*, can at pleasure avoid the contract on the ground of incompetency, after the *non compos* has received and enjoyed a fair equivalent in property better suited to his condition than that which he had parted with, and when there is no offer to restore, nor a possibility of restoring the property which he had received? We think he cannot. The case of an executed contract such as has been described, stands on grounds different from that of an executory contract, and the general privilege of avoiding a contract of the latter kind, does not necessarily imply an equally unlimited privilege of avoiding, under all circumstances, one of the former. It is only recently that a man has

An individual sold two slaves at a fair price, for a tract of land, with the approbation of his father, received a conveyance, entered upon and enjoyed it for 16 or 17 years, when an inquisition was had and he found to be of unsound mind, his committee sued for the slaves.—Held that he was not entitled to recover, as the contract was fair and equal, without fraud.

HOPSON
*vs*
BOYD.

It is only recent-
ly that one has
been allowed to
stultify himself
in a court of law
as the ground of
avoiding an *exe-*
*cutory* contract;
has not at law
been applied to
contracts fully
executed.

been allowed, (after the right had long been denied,) to stultify himself in a Court of law, as the ground of avoiding even his executory contracts; and we do not know of any instance in which a person having intelligence, but still not fully competent to the management of his affairs, has been allowed, on that ground alone to avoid in an ac-tion at law, a contract fully executed on both sides. The Court of Equity has indeed interfered, on the ground of undue advantage taken of the unequal condition of the parties, and we do not know that the remedy at law should be sanctioned on substantially different grounds. Indeed we are not sure but that in all such cases the appeal should be made to the Chancellor, who will interfere only where equity requires it, and will do justice to all parties. Nor have we seen any modern precedent of an action at law by a *non compos* for the avoidance of his own sale. We should be unwilling to sanction the first precedent, where the consequences of a recovery would be flagrantly un-just, where the sale was fair and advantageous to the *non compos*, and made with the sanction of his nearest friend and actual guardian, long before it was thought necessary to appoint a committee for him, and where the consid-eration received on his part, though of a nature to be most permanently servicable to him, has without the fault of the other party, under the promptings of his own sympathy for his parent, and under the opinion of an of-ficer of the law that he was capable of binding himself in a replevy bond, been so disposed of as to be beyond the reach of the party from whom he received it. And we can but remark, as an evidence that the plaintiff, though of weak mind, is far from being devoid either of intelligence, or of a proper sense of moral justice, that after having, with a knowledge of the possible conse-quences, and though cautioned against it, entered into the replevy bond to alleviate his father's open distress where-by his land has been actually lost, he still avows even during the progress of this suit, that he has received full payment for the slaves, and does not wish to recover them.

If there had been any evidence of fraud or imposition, or of inequality in the terms of the contract, the ques-

tion upon such evidence should have been submitted to the jury, and the motion for a non-suit should have failed, and if in the progress of the trial after that motion, any such evidence had been adduced, we should not feel authorized to reverse the judgment, either on the ground of the failure to instruct as in case of a non-suit, or on the ground of the verdict being against the evidence, unless we should deny altogether the incompetency of the plaintiff at the time of his sale, or deny to a *non compos* the right to avoid his sale without restoring what he has received on his part. We are not disposed to adopt either of these latter alternatives. But as there was in the whole trial no evidence of fraud or inequality, we are of opinion that the Court erred in not instructing as in case of a non-suit, and in not granting a new trial.

Wherefore, the judgment is reversed, and the cause remanded for a new trial in conformity with the principles of this opinion.

*Morehead & Reed* for appellant: *Fry & Page* for appellee.