# Williams Coal & Coke Co. et al. v. Spears et al.

Dec. 16, 1938.

JAMES F. BAILEY, Judge.

FRANK C. MALIN, and WHEELER & WHEELER and KIRK & WELLS for appellants.

J. B. CLARK, A. V. POLLOCK, J. L. HARRINGTON, FRANCIS M. BURKE, J. ERWIN SANDERS and RICHARD PRIEST DIETZMAN for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

This is a suit by the children and heirs of Samuel Clark to cancel a deed which he made on May 17, 1909, to John C. C. Mayo conveying the minerals of 623 acres of land in Johnson County. The appellant, Williams Coal and Coke Company, is the owner by mesne conveyances, and the appellant, North East Coal Company, is the operating lessee of the coal. Grounds for cancellation are mental incapacity and undue influence. Forming an issue on those allegations, the defendants affirmatively pleaded ratification, limitations, laches and innocence in purchase. The circuit court decreed a cancellation and adjudged the plaintiffs to be the owner of the coal rights described in the deed; that they reimburse the Williams Coal and Coke Company $9,355.50, being the consideration paid, and $37,166, the amount expended by it for taxes and improvements, a total of $46,521.50; that the plaintiffs recover judgment against the North East Coal Company for $89,354.67, the amount of royalties it had paid to the Williams Coal and Coke Company, less the $46,521.50, conditioned on the North East Coal Company collecting that sum from its co-defendant, against which it was given a cross judgment. It was further adjudged that the coal lease is valid and that the lessee should pay future royalties to the plaintiffs. A decision on the oil and gas rights was held in abeyance. On the appeal, in addition to the defenses pleaded, it is argued that in order to have rescission the plaintiffs must have tendered a restoration of the consideration and taxes paid and expense of improvement, which they did not do.

The evidence is voluminous. That presented in behalf of the plaintiffs showed that Clark was suddenly stricken with glaucoma in August or September, 1907. It destroyed the sight of one eye within a few weeks and the other later on. This disease is severely painful It not only caused blindness and a great degree of deafness but such impairment of Clark's mind that he did not know the nature and extent of his property or understand the deed and its consequences. This condition continued unabated and grew progressively worse until his death on May 22, 1927. Before he was stricken Clark was a hard-working farmer and good business man. Afterward he transacted no business and his two sons, the plaintiffs, Morgan Clark and Logan Clark, controlled his property and attended to all his business. There were three daughters and four sons, all of whom

lived either on the home place or nearby when the deed was made and for sometime thereafter. All knew that the business was being transacted by the two sons.

For the other side, the evidence is that at all times Clark was an outstanding citizen of his community, a man of industry and prudence, of unquestioned strong mentality, and sharp business acumen. This ability and aptitude did not lessen or fail after he lost his eyesight, which appellants contend was some time subsequent to the deed. Their evidence is that before Clark was thus stricken, and as well when the deed was executed, he was in possession of his full faculties; was in no way defrauded; and received an adequate price for his minerals. The proof establishes less doubt of mental incapacity throughout the years following the execution of the deed, and shows that he was alert and active. It is thus proved that he confirmed and ratified the deed by his acts and conversations. Clark received a check for $500 on account of this sale on February 20, 1907, which was two years before he was stricken, and received two checks therefor on February 27, 1909, aggregating $325. It is conceded that the land had been surveyed for Mayo sometime before May 17, 1909. On that date $4,175 was paid, making an aggregate of $5,000. The deferred consideration of $4,500 and interest was deposited to Clark's credit in a bank on May 15, 1912, and he was advised of that fact in writing by the president of the bank. Clark signed a deed of release of the lien. Before that, in May, 1911, he had signed two papers for the bank, one approving the past drawing of checks on his deposit by his four sons, and another authorizing them to continue doing so. In that year, 1911, Samuel Clark and wife conveyed to their son, Morgan Clark, 100 acres of his farm, and the deed contained the exception, "excepting the minerals as heretofore conveyed." In November, 1916, he executed a deed for a part of his farm for a school house. In the latter part of 1913 he purchased two farms in Greenup County. This apparently was with the proceeds of the note which had been deposited to his credit. Two of his daughters moved to that county. One of his sons, J. B. Clark, a practicing attorney, was active in these purchases.

The force of these subsequent transactions as proving rationality and hence a restoration of whatever deficient mental frailty there may have been, and as es-

tablishing a ratification of the Mayo deed, is explained away by the appellees by evidence that their father was during such period but an automaton, conforming to the will of his sons as his business agents.

At various times from 1907 to 1910, agents of the grantees were engaged in prospecting and core drilling for coal on and in the vicinity of this land. At least one of these men, while so engaged, boarded for a time in Clark's home where some of the children lived. When the deed was executed, Morgan Clark and two of his sisters were on the place if some of them were not actually present at the signing. The acknowledgments of Clark and his wife were taken by John P. Wells, her brother, who accompanied Mayo as his attorney. The other children soon learned of the deed. The land was about three miles from the railroad, and it was some time before its development was reached. The lessee spent many thousands of dollars in building mining and transportation facilities. There is no denial that every one of these children and heirs knew everything that was going on. The same is, of course, true as to their father, provided he had sufficient mind to realize the import of the activities. As we understand, actual mining operations did not begin until sometime in 1926, the year before Samuel Clark's death, and three years before this suit was filed on September 26, 1929. When that was done, twenty years had elapsed since the making of the deed. Mayo, the grantee, had been dead 15 years, and Samuel Clark, the grantor, 2½ years. John P. Wells, the attorney who took the acknowledgment, was also dead. Unquestionably, there are present all the elements of laches—unreasonable delay that has worked to a great disadvantage to those against whom it has operated. After 20 years, there were not only resulting obscuration and loss of evidence but changes in titles and conditions of the parties, the expenditure in good faith of large sums of money in developing the property, and many other intervening equities. Culton v. Asher, 149 Ky. 659, 149 S. W. 946; Preston v. Jeffers, 179 Ky. 384, 200 S. W. 654; Finlayson v. Cuyuga Coal & Coke Co., 173 Ky. 763, 191 S. W. 486; Vansant's Ex'x v. Gardner's Ex'x, 240 Ky. 318, 42 S. W. (2d) 300.

It is not to be questioned that the appellees stand in the shoes of their father, and in privity with him. They can assert no right that he could not have asserted and they are chargeable with any negligence or inequi-

table omissions with which he might be charged. Alcorn v. Superior Oil Corp., 245 Ky. 343, 53 S. W. (2d) 528. His laches is their laches. 21 C. J. 216. But appellees rely on the rule that laches is not imputable to a person while he is under legal disability, such as unsoundness of mind or mental affliction, which does not wholly incapacitate him but which does render him incompetent to dispose of his property. Hopson v. Daniel's Guardian, 218 Ky. 321, 291 S. W. 379; First State Bank of Pineville v. Catron, 268 Ky. 513, 105 S. W. (2d) 162; Pomeroy's Equity Jur., Section 1451; 9 C. J. 203, 21 C. J. 239, 241; 12 C. J. S., Cancellation of Instruments, Section 51b. The appellees are confronted by a dilemma.

Let it be conceded for the purpose of the decision that the grantor was incapacitated when the negotiations for the purchase of his land were begun, when the deed was executed, and when he accepted part of the purchase money: Let it be further conceded that there was never any restoration of his mental faculties, or any substantial period of soundness of mind so that limitations began to run, or his action or failure to disaffirm may be deemed a ratification, or give a basis for estoppel. See Clark's Ex'r v. Trail's Adm'rs, 58 Ky. 35, 1 Metc. 35; Spicer v. Holbrook, 96 S. W. 571, 29 Ky. Law Rep. 865; Kingman's Committee v. First National Bank of Mayfield, 246 Ky. 404, 55 S. W. (2d) 39. That being the premise, the legal conclusion is that it was not until the grantor's death that the limitation period began, or there was incipient delay. Their right of action accrued or their duty to act and disaffirm arose upon his death. Breckenridge's Heirs v. Ormsby, 1 J. J. Marsh. 236, 19 Am. Dec. 71. Such is the law in the usual case, where there is merely a successive right. The appellees invoke that rule, which under such a state of fact is sound and salutary. But have they themselves been so free from neglect as to entitle them to invoke that rule to their great benefit and profit? Are they not themselves guilty of inequitable conduct in having failed sooner to act? All of them knew of the deed and the subsequent activity and expenditure of great sums of money by the appellants in exploring and developing the property. Two of them were managing the business affairs of their father as his natural guardians or committee. All stood by in silent acquiescence. If their father was in the mental state now claimed and they knew that he

had been imposed upon,—justice to him, to themselves, and to other parties called for some action on their part during these years. There was a duty devolving upon them to proceed to have him legally declared incompetent and to have had a committee appointed for him who could have maintained suit years ago before the other parties suffered harm and loss.

In James v. Hill, 140 Ga. 739, 79 S. E. 782, the heirs of a grantor brought suit against his grantee and persons holding by purchase under him to cancel a deed and recover the land on the ground that their ancestor was insane or lacking mental capacity to make the deed, of which the defendants had notice. The grantor had died about a year afterward, but suit was not brought for fourteen years. No reason was shown why the plaintiffs did not know or by the slightest diligence could not have known of the substantial facts so as to bring the suit within a reasonable time after the deed was executed and after the grantor's death. It was held that the petition was properly dismissed on demurrer on the ground that it was stale and plaintiffs were guilty of laches.

In McCann v. Welch, 106 Wis. 142, 81 N. W. 996, a deed had been executed by a wife while in extremis to her husband. Thirteen years later two of her children by a former husband, who were not present when the deed was made, and who were not shown to have had actual knowledge thereof, joined with the other children who knew all about the deed and their father's subsequent transactions in relation thereto, in bringing suit to cancel the deed. The statute of limitations was pleaded in defense. The case was decided against the two ignorant plaintiffs on the ground of adverse possession by the grantee. As to the others, it could not be said they had been entitled to sue for possession of the land until the death of their father. Its pertinence justifies the following extended quotation:

"In the case before us we have complete supineness on the part of the plaintiffs for more than the statutory period, not in ignorance, but with full knowledge and understanding of the aggression upon their rights now complained of. That silence and submissiveness commenced with conduct well justifying the belief that they affirmatively acquiesced in the rights asserted by their father. They

were all present at the time the deed was drawn and their mother's mark affixed, all of full age, and all so conducted themselves that the justice, Elwell, understood that the conveyance was in accord with the wish of all of them. One, at least, has accepted pecuniary benefit from the mortgaging of this farm by Patrick as his absolute property. Meanwhile defendants' means of defense have been seriously impaired. * * * Further, the plaintiffs have at all times had reason to anticipate that Patrick might further dispose of the land for his own benefit, and have preserved silence, dissembling their objections, if they had any, until the defendant Bridget, with knowledge of all this conduct, has subjected herself to contractual burdens which there is no reason to believe she would have assumed had these plaintiffs asserted their present claims timeously. Such conduct as the foregoing brings these plaintiffs within the reasons which have induced courts of equity to bar their doors to applicants guilty of much less delay.''

The principle of that opinion is applicable to the case at bar. Cf. Hopson v. Boyd, 45 Ky. 296, 6 B. Mon. 296; Finlayson v. Cuyuga Coal & Coke Co., supra. The children, everyone sui juris, stood by with full knowledge of the facts and watched the other parties make large expenditures in reliance upon the conveyance of their father to their remote grantee without protest or affirmative action toward rescission. It is to be observed, in this connection, as an important factor, that most of the development and operation was only a year or so before the father's death and nearly three years after plaintiffs acquired a right of action in their own names. ''The rule is clear and proper that one is concluded not only by what he does or says, but by the natural and reasonable inference from his declarations or conduct.'' Irvine v. Scott, 85 Ky. 260, 3 S. W. 163, 164, 8 Ky. Law Rep. 911.

We are aware of cases holding that the heirs of an insane person seeking to set aside a sale of land are not chargeable with laches of others not legally chargeable with the protection of his rights who failed to act during the life of their ancestor. Hemphill v. Holford, 88 Mich. 293, 50 N. W. 300; Ring v. Lawless, 190 Ill. 520, 60 N. E. 881; Jefferson v. Rust, 149 Iowa 594, 128 N. W. 954; Heyl v. Goelz, 97 Wis. 327, 72 N. W. 626; Kidder v.

Houston, N. J. Ch., 47 A. 336. But an examination of each of those cases discloses a very different state of facts. None of them can be regarded as an authority in this case.

Though only two of the plaintiffs were in active charge of their father's business and the duty peculiarly devolved upon them, the others who knew the entire situation are equally bound. All of them were personally benefited by the use of the proceeds. We have as an analogy the rule that where a cause of action for setting aside a deed accrues to a class, part of whom are sui juris and part under disability, the statute of limitations runs against all of them. Combs v. Grigsby, 200 Ky. 31, 252 S. W. 111. So should it be in the application of estoppel arising from laches.

The maxim, "Equity aids the vigilant, not those who slumber on their rights" operates throughout the entire remedial portion of equity jurisprudence. It is but a special form of the more general principle that "He who seeks equity must do equity." Section 418 Pomeroy. "If a man is silent when he ought to speak, equity will debar him from speaking when conscience requires him to be silent." Lyne v. Bank of Kentucky, 28 Ky. 545, 5 J. J. Marsh. 545. It seems to us that this is a clear case for the application of those wholesome maxims. The plaintiffs have not shown an equitable right to have the deed cancelled or to any of the relief sought by their petition.

Wherefore the judgment is reversed.

Whole Court sitting.