RENDERED:  SEPTEMBER 8, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1172-MR

KATHRYN S. WATTS; JEREMY
JANES; MARY VIRGINIA CAREY;
AND PATRICIA F. SMITH                                              APPELLANTS


APPEAL FROM NELSON CIRCUIT COURT
v.         HONORABLE KELLY MARK EASTON, SPECIAL JUDGE
ACTION NO. 21-CI-00505


FRANCIS X. SMITH, SR. AND
THOMAS STOCKER SMITH,
TRUSTEE OF THE THOMAS
STOCKER SMITH DECLARATION
OF TRUST U/A DATED 1/5/2018                                        APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, DIXON, AND ECKERLE, JUDGES.

COMBS, JUDGE:  This appeal arises from an action for a declaratory judgment.

The trial court determined that a 1972 Stock Restriction Agreement is a valid and

binding agreement governing the ***process*** of the sale of shares of Smith Brothers

Distributing Company.  After our review, we affirm.

Smith Brothers Distributing Company is a beer distributorship which was incorporated in 1971 under the laws of Kentucky. The trial court's Declaratory Judgment provides a summary of the underlying facts:

> Beginning in the 1940's, B.L. [Bertram L.] Smith and his wife Sylvia built a successful business related to the distribution of alcohol. After thirty years, B.L. and Sylvia decided to turn this enterprise over to the next generation, their eight children: Rapier [Charles R. Smith, Sr.], Bert, Francis [Francis X. Smith], Willie, Tom [Thomas S. Smith], Mary, Pat, and Ginny. One of the business entities they created is Smith Brothers Distributing Company ("SBDC").
>
> As the initial president and vice-president of SBDC, B.L. and Sylvia crafted the [1972] Stock Restriction Agreement ("SRA") which is the primary subject of this case. SBDC started with 208 shares of stock. The Smiths' children each received a gift of 26 shares. Over the years since, these shares have remained with SBDC or in the extended Smith family. Presently, there are four owners, individually or by group.[1] Each has a 25% interest in SBDC, each having 26 of the remaining 104 shares.
>
> One of the share blocks of 25% will be referred to as the Rapier block. Rapier's 25% interest passed through a gift trust to his seven children: Sylvia, Kat[y], Ginny, Chuck, Frank, Margie, and Amy. At least to some extent, there has been a falling out among the Rapier block shareholders. They appear to be aligned in a 4-3 split. The present controversy arose when Margie let it be known she was considering selling her shares.

---

[1] The four owners are: Francis X. Smith; Thomas S. Smith; Patricia F. Smith (Patsy), widow of Willie Smith; and the Rapier Smith Shareholders.

In relevant part, the 1972 agreement (SRA) sets forth its purpose as follows:

> . . . the Stockholders desire to promote, protect and preserve their mutual interests and the interests of the Corporation by assuring continuity of stock ownership and corporate control, and by imposing certain restrictions and obligations on themselves, the Corporation, and the share of stock of the Corporation.

Paragraph 1 of the 1972 SRA provides that "[a]ny stockholder may transfer all or a part of his stock of the Corporation by gift" to or for the benefit of an immediate family member "without the written consent of all other stockholders."

As summarized by the trial court:

> If the shareholder does not want to give the stock away to or for the benefit of a family member, the SRA establishes a step-by-step process. First Paragraph 2 directs the shareholder to give forty days' notice to the corporation and all shareholders of the intent to sell the stock. A meeting must be conducted within the same forty days. At that meeting, the SBDC can purchase or retire the stock offered.
>
> If any stock is left after SBDC makes its decision, then the other shareholders may purchase the stock in proportionate shares, which is a clearly defined term in Paragraph 3. After that part of the process, B.L. and Sylvia reserved to themselves an option to purchase the shares in Paragraph 4. That provision is moot now, since both have passed away. If the stock is not retired or purchased through Paragraphs 2 and 3, the stockholder then has complete freedom to sell as they wish under Paragraph 5.

**Paragraph 6 is particularly telling when assessing the overall intent of the SRA**.  If the stockholder with the complete freedom to do so does not sell the stock to another, the shareholder may ask the corporation to buy the shares.  If the shareholder chooses this option, then the corporation must buy back the stock.  If the corporation does not then buy the stock back, the corporation dissolves.  **This destruction provision is part of the clear theme of the SRA for the stock to stay in the family whether held by the corporation of [*sic*] the family members who hold the stock**.

(Bold-face emphases added.)

Paragraph 7 of the SRA is central to the issue on appeal and provides

as follows in relevant part:

(a) The purchase price for any stock of the Corporation, purchased under the terms of this Agreement by the Corporation, or by the Stockholders, or by Bertram L. Smith, Sr., or Sylvia R. Smith, shall be $100.00 per each share of the Corporation outstanding common stock adjusted for stock dividends and stock split after the date of this Agreement and until the first Monday in July, 1975, when a new value will be determined if all shareholders of the Corporation's outstanding stock agree thereto.  If the shareholders do not agree th[e]n the Stock Restriction Agreement terminates in accordance with Paragraph 13 hereof.

Paragraph 13 provides that:

This Agreement shall become effective as of the date hereof and shall continue in full force and effect until terminated by the mutual agreement of all of the parties hereto, or by voluntary or involuntary dissolution of the Corporation, or upon adjudication of the Corporation as a bankrupt, whichever event occurs first.

The original stockholders did not exercise their option to set a new stock value after the three-year term expired in July 1975.

On October 28, 2021, SBDC filed a petition in Nelson Circuit Court seeking a declaratory judgment regarding the transferability and ownership of shares of SBDC stock and a resolution of issues regarding the 1972 SRA with respect to the Respondents/Shareholders.

On November 22, 2021, Kathryn S. Watts (Katy) and Patricia F. Smith (Patsy) in their capacity as directors of SBDC, filed a motion to dismiss on grounds that the petition -- which they opposed -- was not authorized by a majority of the company's four directors:  Katy, Patsy, Francis, and Tom.

On December 10, 2021, Francis and Tom filed an answer and a cross-claim for declaration of rights, asserting that the 1972 SRA is a valid and binding agreement that governs the transfer of shares of the company and applies to the signatories and all subsequent transferees.  Furthermore, they take issue with the argument of the Respondents as to their claim that a December 21, 2016 Shareholders' Agreement "abrogates, modifies, or takes precedence over the 1972 Stock Restriction Agreement."

By Order entered on March 14, 2022, the trial court granted the motion to dismiss and ordered that "this case will continue on the Cross-Petition

for the same declaration of rights.  The questions then to be addressed are the validity and application of the two agreements."

On June 2-3, 2022, the trial court conducted an evidentiary hearing, and the matter was submitted on post-hearing briefs.  The Cross-Claim Petitioners, Francis and Tom, argued that:  1) the 1972 SRA remains in full force and effect and has not terminated by its own terms because none of the events listed in Paragraph 13 has occurred; 2) that it is undisputed that every SBDC stock certificate issued since approximately 1972 bears an imprinted endorsement that the stock is subject to the 1972 SRA transfer restrictions,[2] thus binding the Cross-Claim Respondents by its terms; 3) that waiver and estoppel operate as a bar to Respondents' claims because their conduct constitutes acquiescence; and 4) that the 2016 Agreement is void as an improper amendment to an irrevocable trust and that it cannot abrogate or modify the 1972 SRA.

---

[2] Paragraph 11 of the 1972 SRA provides that:

> Upon the execution of this Agreement, the Certificates of stock held by each of the stockholders to this Agreement shall have conspicuously endorsed or imprinted on stock certificates held by them the following statement:
>
> "The shares of stock of SMITH BROTHERS DISTRIBUTING COMPANY, represented by this certificate are restricted as to transfer and sale according to Stock Restriction Agreement made and entered into the 8th day of January, 1972, and approved at the first meeting of the stockholders on said date, to which [] reference is made as to the restriction on the transfer of this stock."

In their post-hearing brief, the Cross-Claim Respondents requested that the trial court dismiss the Cross-Claim and rule that the 1972 SRA is unenforceable. Specifically, they argued: 1) that Rapier never signed the 1972 SRA; 2) that even if the 1972 SRA had been valid when executed, it terminated by its own terms in 1975 pursuant to Paragraph 7; 3) that even if the 1972 SRA was enforceable beyond 1975, the shareholders abandoned it by acting inconsistently with its terms; 4) that even if the 1972 SRA is still in effect, the lack of a pricing term renders it unenforceable; and 5) that should the court determine that the 1972 SRA remains in full force, its terms do not prohibit execution of the 2016 Agreement among the Rapier Smith shareholders.

On August 29, 2022, the trial court entered a Declaratory Judgment in relevant part as follows:

> Before addressing the legal issues presented, **the Court notes equitable arguments asserted**. . . . **First "equity follows the law."** In other words, **if the rights of the parties are governed by legal principles, such as the law relating to contract interpretation, then equity should not be applied** routinely to change the rights of the parties. <u>Morton v. Bank of the Bluegrass and Trust Co.</u>, 18 S.W.3d 353 (Ky. App. 1999) (Footnote 4).

> Parties have also suggested the "unclean hands" doctrine to prevent the application of equitable relief. This rule is not an absolute bar to relief and often requires a comparison of the parties' conduct. <u>Suter v. Mazyck</u>, 226 S.W.3d 837, 843 (Ky. 2007). In this case, both sides list complaints against the other leaving real doubt about the cleanliness of hands all around.

-7-

The equitable principle most applicable is . . . "equity aids the vigilant, not those who slumber on their rights." Williams Coal and Coke Co. v. Spears, 125 S.W.2d 745, 748 (Ky. 1938). Some complaints about past transactions fit within this concept as will be explained hereafter. **Ultimately, the Court has applied the law and concludes the law provides a correct and equitable answer**.

(Bold-face emphases added.)

Next, the trial court addressed the challenge to the authenticity of Rapier's signature on the 1972 SRA. The court explained that opinion testimony is allowed from witnesses familiar with an individual's handwriting, citing KRE[3] 901(b)(2), KRE 701. However, the court was not persuaded by the testimony of Rapier's daughters that the signature did not appear to be that of their father -- nor by Francis's opinion to the contrary -- given that "[e]ach of the witnesses has a substantial financial interest which may influence their opinions." Rather, the trial court based its determination that the signature on the SRA was Rapier's after having compared it to his undisputed signature on other exhibits and upon other circumstantial evidence. Rapier's signature was not disputed for 50 years, and Tom testified that B.L. would not have allowed stock to be issued to any of the children unless he was satisfied they had signed the SRA. The trial court also noted that the SRA is mentioned on every stock certificate and that if Rapier's

---

[3] Kentucky Rules of Evidence.

-8-

signature had been forged, it would be "implausible" to believe that he would not have been aware of it.  The trial court found that:

> **Rapier signed the SRA.  As a result, it was a unanimous agreement among all stockholders. Unanimity is an important theme in the SRA.  B.L. also clearly designed the SRA to keep SBDC "in the family."**  Before analyzing the SRA further, the Court should address the long shadow cast by an important business partner which is not a party to this suit.
>
> One estimate suggests 90% of SBDC's business is with Anheuser-Busch ("A-B").  Contracts between SBDC and A-B have heavily influenced decisions by SBDC and its shareholders over the years. . . .
>
> . . . Regardless of the impact of the agreements with A-B, those agreements are not in dispute here.  The Court need not lose focus with detailed analysis of those agreements.
>
> . . .
>
> With these distractions aside, **the Court must analyze the SRA as a contract**.  At the outset, the Court will not engage in the semantic battle about the SRA being a buy-sell agreement. It is.  As we will see, **this nomenclature is not controlling for the SRA's legal impact**.
>
> . . . Under contract law, **the law looks for the intent of the parties** as they stated it.  Every word should be considered.  The Court should not add or subtract words.  The Court must look at every provision in context with the entire agreement being considered together.  See e.g., City of Louisa v. Newland, 705 S.W.2d 916 (Ky. 1986).
>
> . . .

The main contention of the Rapier block is the price provision in Paragraph 7. An initial value was set with an option to reset that price in 1975[4] "if all shareholders . . . agree thereto." The choice of the verb "will" versus the mandatory "shall" is significant. That never happened, although it should have. If no price was agreed upon, the SRA "terminates in accordance with Paragraph 13 hereof."

This creates an arguable ambiguity for the SRA. The Rapier block argues without a price being set in 1975, the SRA must terminate. They contend the use of the word "accordance" does not revive the SRA under Paragraph 13 after the price failure under Paragraph 7.

**Paragraph 13 does not mention Paragraph 7 or any price provision. It permits termination only in case of unanimous agreement, dissolution, or bankruptcy. It is curious a termination was not directed by Paragraph 7 itself. It that was the intent, it could have been simply and clearly stated there**.

**The use of the word "accordance" is significant**. When a contract does not provide a definition within it, we look for the usual meaning of a word with recognition of the legal context of a contract. References to dictionaries may be appropriate. See Hensley v. Gadd, 560 S.W.3d 516 (Ky. 2018).

Black's Law Dictionary (5th Ed.) defines accordance as "agreement, harmony, concord, conformity." Applying this definition to the reference in Paragraph 7 to Paragraph 13, **the Court concludes the intent of the SRA was not to terminate the SRA if a price was not set in 1975**. The parties could set a price at any time when and if a sale was to be considered.

---

[4] "[W]hen a new value will be determined . . . ." This is the language referenced from paragraph 7 utilizing "will" instead of the mandatory "shall."

The Rapier block argument proceeds from an assumption that any buy sell agreement **must** fix a price. **There is not just one type of buy sell agreement**. **The SRA is about process more than price**. Regardless of a set price, the SRA still requires a process for offering stock outside of a family gift. The Rapier block has a point with the absence of a price term being simply an unenforceable "agreement to agree," but **when we look at the required process of the SRA, the price term does not control**.

The Court will illustrate this with an example of how an offer would apply in the context of the SRA and the 2016 Agreement of the Rapier block. **To do this, the Court must assume (but not decide) the manner in which the 2016 agreement was imposed upon the current Rapier block shareholders is valid. The trustees of Rapier's gift trust imposed the 2016 agreement with apparently no input from some of the individual shareholders. This may be the subject of a further suit, but it is not necessary to decide with respect to the primacy of the SRA**.

Against this understanding of the SRA process, it becomes clear **the 2016 Agreement for the Rapier block is invalid to the extent it is in conflict with the SRA**. Only if a shareholder gets through Paragraphs 2 and 3 of the SRA could the later Rapier block 2016 agreement restrictions apply. It could then otherwise limit the absolute freedom the SRA provides in Paragraph 5.

Margie tested this process. She and her counsel have made clear they never intended an actual offer to sell. Even so, it was treated as such with an attempt at the SRA process. Perhaps fortunately, this process was not consummated. Margie is still bound by all the provisions of the SRA.

> The fact this was not an actual offer does not lessen the need for a declaration of rights for these parties with respect to the conflicting agreements. . . .

(Underline original, bold-face emphases added.)

The trial court then provided a detailed example of how it would work if a member of the "badly divided Rapier block" decided to sell his or her shares under the terms of the SRA. The court concluded that: "[i]n summary, **the SRA is a valid and binding agreement which governs the process of the sale of SBDC shares**. The 2016 agreement among the Rapier block shareholders only applies after compliance with the process of paragraphs 2 and 3 of the SRA." (Bold-face emphasis added.)

On September 29, 2022, Kathryn S. Watts, Patricia F. Smith, Jeremy Janes, and Mary Virginia Carey (collectively Appellants), filed a Notice of Appeal to this Court.

> This court reviews the decision of a circuit court in a declaratory judgment action under the clearly erroneous standard set forth in CR[5] 52.01. Under CR 52.01, the circuit court's findings of fact shall not be set aside unless clearly erroneous and due regard shall be given to the opportunity of the circuit court to assess the credibility of the witnesses.

*Reynolds Enterprises, Inc. v. Kentucky Bd. of Embalmers and Funeral Directors*, 382 S.W.3d 47, 49 (Ky. App. 2012) (citation omitted).

---

[5] Kentucky Rules of Civil Procedure.

First, Appellants argue that the trial court erred in finding that Rapier signed the 1972 SRA. They contend that Appellees failed to sufficiently rebut the testimony of Rapier's daughters, who did not believe that the signature was their father's. The trial court did not find this testimony dispositive because "[e]ach of the witnesses has a substantial financial interest which may influence their opinions." Credibility determinations and the weight to be given to the evidence lie "within the province of the trial court as the fact-finder[.]" *God's Center Foundation, Inc. v. Lexington Fayette Urban Cnty. Government*, 125 S.W.3d 295, 300 (Ky. App. 2002). Even uncontradicted, the testimony of an interested witness does not bind the factfinder. *Grider Hill Dock, Inc. v. Sloan*, 448 S.W.2d 373 (Ky. 1969). Thus, we find no error on this issue.

Next, Appellants argue that the trial court misapplied contract interpretation principles in finding that the 1972 SRA did not expire in July 1975.

> The primary object in construing a contract . . . is to effectuate the intentions of the parties. Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible.
>
> Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties. Absent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence. . . . Generally, the interpretation of a contract, including determining

> whether a contract is ambiguous, is a question of law for the courts and is subject to *de novo* review.

*Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384-85 (Ky. App. 2002) (internal quotation marks and citations omitted).

Appellants argue that the trial court erred in finding that the language in Paragraph 7 (*i.e.*, that if no price was agreed upon, the SRA terminates in accordance with Paragraph 13) "creates an arguable ambiguity for the SRA." Appellants contend that these provisions are not ambiguous. We agree. They are not. However, we do not agree with Appellants that the trial court misapplied principles of contract interpretation or that it reached an incorrect result in the case before us.

Although the trial court commented that the language created an ***arguable*** ambiguity, the trial court did not make a determination that the SRA was in fact ambiguous. The trial court was merely treating the issue of an alleged ambiguity as the subject of its own thought process, analysis, and ruminations. We agree with Appellees that "[t]he trial court applied the plain meaning of the terms in the SRA within the four corners of the document and did not look to extrinsic evidence to interpret or construe the procedure set forth within." It so concluded after weighing all "arguable" aspects of the allegation of ambiguity.

To recapitulate, the language of Paragraph 7 did not require or mandate that the shareholders establish a new value by the first Monday in July

-14-

1975.  And as the trial court observed, "a termination was not directed by Paragraph 7 itself."  Instead, Paragraph 7 provides that the SRA would terminate in accordance with Paragraph 13.

Paragraph 13 provides that the SRA "shall continue in full force and effect until terminated by [1] the mutual agreement of all of the parties hereto, or [2] by voluntary or involuntary dissolution of the Corporation, or [3] upon adjudication of the Corporation as a bankrupt, whichever event occurs first."  We agree with Appellees that none of those events has occurred.  Accordingly, we conclude that the SRA has remained in full force and effect.

Third, Appellants argue that the trial court erred in finding that the 1972 SRA remains enforceable despite lack of a material price term.  A "basic principle of contract law . . . requires substantial certainty as to the material terms upon which the minds of the parties have met . . . ." *Walker v. Keith*, 382 S.W.2d 198, 204-05 (Ky. 1964).  "[A]n agreement to agree cannot constitute a binding contract." *Id.* at 201.  "However, a contract need only be definite and certain as to those terms that are 'material and essential' to the parties' agreement." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (citations omitted).

In the case before us, the trial court did not consider price to be a material term.  As the trial court observed, Appellants' argument "proceeds from an assumption that any buy sell agreement must fix a price."  "The mistake in that

argument is fundamental. Terms that are material to one kind of contract are not necessarily material to another kind of contract." *Dalton v. Robert Jahn Corp.*, 146 P.3d 399, 412 (Or. App. 2006). The trial court explained that there is more than one type of buy-sell agreement; that the 1972 SRA is more about process than price; and that "when we look at the required process of the SRA, the price term does not control." (Underline original.) We agree with the trial court's analysis. The trial court correctly determined that the "SRA is a valid and binding agreement which governs the ***process*** of the sale of SBDC shares." (Emphasis added.)

Appellants' fourth argument is that the trial court erred in finding that the 1972 SRA was not abandoned, a conclusion that is implicit in the court's determination that the SRA is a valid and binding agreement. In essence, Appellants re-argue their case. Under Kentucky law, "[a] contract may be abandoned expressly or implicitly by the parties acting inconsistently with its terms." *L.K. Comstock & Co., Inc. v. Becon Constr. Co., Inc.*, 932 F. Supp. 906, 931 (E.D. Ky. 1993). And "the proof must be clear and convincing to sustain a finding that the contract has been abandoned." *Id.* at 933. The parties point to conflicting evidence on this issue. The trial court noted that the SRA is mentioned on every stock certificate. It found that in 1985, Tom recognized the applicability of the SRA in communication with SBDC and that Mary sold her stock consistent with the options of the SRA. The trial court concluded that subsequent transfers

-16-

were accomplished consistent with the SRA -- even if it were not explicitly mentioned. The trial court's findings are supported by substantial evidence. Thus, there is no basis for reversal. CR 52.01.

Appellants' last two arguments involve equitable considerations. Appellants argue that the trial court erred in rejecting their argument that Appellees should be precluded from relying on equitable principles because they have unclean hands. As Appellees note, Appellants fail to point out in the Declaratory Judgment where the trial court committed this alleged error. Appellants also argue that the trial court erred in finding that they "slumbered on" or were not vigilant in pursuing their rights -- or that they otherwise acquiesced to the 1972 SRA. It appears that Appellants may have misperceived the basis of the trial court's decision. As set forth above, the trial court clearly acknowledged the parties' equitable arguments. However, it clearly articulated that equity follows the law, ultimately resolving the issues before it on legal grounds. We find no error.

We affirm the Declaratory Judgment of the Nelson Circuit Court.


ALL CONCUR.

BRIEFS FOR APPELLANTS:

John S. Lueken
Benjamin J. Lewis
Chelsea Granville Reed
Louisville, Kentucky

BRIEF FOR APPELLEES:

Jay E. Ingle
John W. Hays
Lexington, Kentucky